Paul L. McDonald
P L MᴄDᴏɴᴀʟᴅ LAW LLC
1800 JFK Boulevard, Suite 300
Philadelphia, PA 19103
Telephone:   (267) 238-3835
Facsimile:   (267) 238-3801
Email:       paul@plmcdonaldlaw.com

*Counsel for Plaintiff and
the Proposed Collective*

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAWRENCE "POPPY" LIVERS, on his own behalf and on behalf of similarly situated persons, | |
| Plaintiff, | Civil Action No. |
| v. | **COMPLAINT – CLASS ACTION AND JURY DEMAND** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a/k/a the NCAA, and the following NCAA Division I Member Schools[i] as representatives of a Defendant Class of all private and semi-public member schools that entered/enter into Athletic Financial Aid Agreements with the Plaintiff Collective: | |

BUCKNELL UNIVERSITY,
DREXEL UNIVERSITY,
DUQUESNE UNIVERSITY,
FAIRLEIGH DICKINSON UNIVERSITY,
LA SALLE UNIVERSITY,
LAFAYETTE COLLEGE,
LEHIGH UNIVERSITY,
MONMOUTH UNIVERSITY,
RIDER UNIVERSITY,
ROBERT MORRIS UNIVERSITY,
SETON HALL UNIVERSITY,
SAINT FRANCIS UNIVERSITY,
SAINT JOSEPH'S UNIVERSITY,
ST. PETER'S UNIVERSITY,
VILLANOVA UNIVERSITY,

---

[i]   NCAA Division I Member Schools are sued in their respective incorporated names and/or in the name of their respective Board of Regents or Board of Trustees.

UNIVERSITY OF DELAWARE,
PENNSYLVANIA STATE UNIVERSITY,
UNIVERSITY OF PITTSBURGH,
RUTGERS, STATE UNIVERSITY OF
  NEW JERSEY, and
TEMPLE UNIVERSITY,

                  Defendants.

www.StudentAthleteEquity.com

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................ 1

**JURISDICTION AND VENUE** ......................................................... 3

**THE PARTIES** .............................................................................. 5

    PLAINTIFF LAWRENCE "POPPY" LIVERS ............................................. 5

    DEFENDANTS ............................................................................... 5

**SCHOLARSHIP ATHLETE COLLECTIVE ALLEGATIONS** ................ 6

**DEFENDANT CLASS ACTION ALLEGATIONS** ............................... 7

**FACTUAL ALLEGATIONS** ........................................................... 10

    THE SCHOLARSHIP ATHLETE COLLECTIVE ....................................... 10

      • Academic and Athletic Scholarships Are **Not** Compensation ......................... 10

      • By Comparison to Academic Scholarships, Athletic Scholarships Impose Additional, and Unparalleled, Obligations and Limitations on Scholarship Athletes ........................................................... 11

        - *Scholarship Athletes Are Obligated to Participate in NCAA Athletics That Interfere With, Rather Than Facilitate, Academic Studies* ............. 11

        - *Scholarship Athletes Are Prohibited from Earning Fungible Pay That Can Be Spent on Living Expenses **Not** Covered by Scholarship* ....... 17

        - *Scholarship Athletes Are Subject to Far Stricter Discretionary Control of Student Performance and Conduct by College Supervisory Staff* ............. 18

        - *Scholarship Athletes Are Subject to Far Stricter Discretionary Control of Student Options to Transfer by College Supervisory Staff* ..................... 22

      • Under the FLSA, Scholarship Athletes Are Employees As Much As, and Arguably More Than, Students Employed by NCAA Member Schools in Work Study Programs ........................................................... 24

      • In Contrast to Scholarship Athletes and Students in Work Study Programs, Members of Student-Run Groups Are **Not** Employees under the FLSA ........... 26

www.StudentAthleteEquity.com

- Under the FLSA, Revenue-Generation Is **Not** Required to Meet Criteria for Employee Status and Compensation ..................................................... 30

  - *While Revenue-Generation Is **Not** Required under the FLSA, Athletic Performance Is the Sine Qua Non of the Business of Sports* ........ 31

  - *Degree of Profitability **Neither** Determines **Nor** Discharges Duties to Properly Classify and Compensate Employees under the FLSA* ............... 32

- Scholarship Athletes Are **Not** Exempted from FLSA Coverage by Constitutional or Statutory Language ......................................................... 39

  - *The Thirteenth Amendment's FLSA Exemption for Unpaid Prison Labor Does **Not** Apply to Student Athletes* ..................... 39

  - *There Is **Neither** A "Student Athlete" **Nor** "Amateurism" Exemption in Statutory Language of the FLSA* ....................................................... 41

JOINT EMPLOYMENT OF SCHOLARSHIP ATHLETES .................................……........... 42

- NCAA Restrictions on Unilateral Discretion in Recruiting ............................ 42

- NCAA Restrictions on Unilateral Discretion in Determining Eligibility for Hire or to Participate ........................................................... 45

- NCAA Restrictions on Unilateral Discretion in Supervision .........................…...... 45

- NCAA Restrictions on Unilateral Discretion in Compensation ..................... 46

- NCAA Restrictions on Unilateral Discretion in Duration of Employment or Participation ................................................................. 46

- NCAA Restrictions on Unilateral Discretion in Discipline ............................ 47

- Enforcement of NCAA Restrictions on Unilateral Discretion in Terms and Conditions of Scholarship Athlete Labor ..................................... 47

PLAINTIFF LAWRENCE "POPPY" LIVERS ............................................................. 48

**CAUSE OF ACTION** ....................................................................................... 49

FAIR LABOR STANDARDS ACT | MINIMUM WAGE PROVISION ................................... 49

**PRAYER FOR RELIEF** ..................................................................................... 50

**DEMAND FOR JURY TRIAL** ............................................................................ 52

Plaintiff, on his own behalf and on behalf of all others similarly situated, by undersigned counsel, for his Complaint herein alleges as follows:

## INTRODUCTION

1.     Defendants in this action – the National Collegiate Athletic Association ("NCAA") and private and semi-public NCAA Division I member schools that entered/enter into Athletic Financial Aid Agreements requiring recipients of athletic scholarships to participate in NCAA athletics – have jointly agreed to violate wage and hour provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), as described herein.

2.     The crux of this Complaint is that recipients of athletic scholarships, which require them to participate in NCAA athletics under daily supervision of full-time coaching and training staff, *i.e.*, "Scholarship Athletes," are employees of NCAA member schools as much as, and arguably more than, fellow students employed in work study programs,[1] *e.g.*, student ticket takers, seating attendants and food concession workers at NCAA contests.

3.     In both work study programs and NCAA athletics:

- student performance outside the classroom is: (i) non-academic in nature; (ii) unrelated/irrelevant to an academic degree program; (iii) not for academic credit; and (iv) supposed to be restricted to 20 hours per week, recorded on **timesheets** maintained by supervising staff of the NCAA member school, to limit interference with academic studies;

- student performance primarily benefits NCAA member schools, and provides no *comparable* academic or learning benefit to the student; and

- NCAA member schools hire supervisory staff for the express and full-time purpose of controlling and directing student performance, both as to the result to be achieved and details by which that result is achieved.

---

[1]     "Work study programs," as herein referenced, include *all* student employment by a college – both pursuant, and **not** pursuant, to a federal program(s).

www.StudentAthleteEquity.com

4.      While student ticket takers, seating attendants and food concession workers at NCAA contests are classified as employees and paid on a minimum wage scale, the Scholarship Athletes, whose athletic performance creates those work study jobs at the ticket gate, in the seats, and in the concession stands, are **not** paid.

5.      For reasons set forth in Paragraphs 46 through 50, *infra*, **neither** academic **nor** athletic scholarships are compensation for performance.

6.      This Complaint differs from *Berger v. NCAA et al.*, No. 1:14-CV-1710 (S.D. Ind. Mar. 18, 2015) in that the collective in this Complaint *only* includes Scholarship Athletes, and does **not** address the status of "walk-ons," *i.e.*, student athletes who are **not** obligated to, and controlled by, NCAA member schools pursuant to Athletic Financial Aid Agreements.

The plaintiffs in *Berger* attended the University of Pennsylvania, which, as all members of the Ivy League, does **not** enter into Athletic Financial Aid Agreements.

7.      This Complaint differs from *Dawson v. NCAA et al.*, No. 3:16-CV-05487 (N.D. Cal. Sept. 26, 2016) in that, *inter alia*, it sues NCAA member schools which employ coaches, trainers and athletics department personnel for the express and full-time purpose of controlling and directing Scholarship Athletes' performance.  Because of daily supervision by such staff, NCAA member schools are cognizable employers of Scholarship Athletes.

By contrast, Dawson did **not** sue any member school.  Instead, Dawson sued a NCAA member conference (the Pacific-12 Conference), which does **not** employ any coaches, trainers or athletics department personnel and, thus, is too far removed from daily supervision of Scholarship Athletes to be a cognizable employer of Scholarship Athletes.  Furthermore, the NCAA bylaws relevant to joint employment of Scholarship Athletes, set forth in Paragraphs 146 through 174, *infra*, govern NCAA member schools, outlining their shared responsibilities and restricting their unilateral discretion regarding the terms and conditions of Scholarship Athlete labor – **not** member conferences.

-2-

8.     Plaintiff brings this action for unpaid minimum wages, on his own behalf and on behalf of all others similarly situated who elect to opt-in pursuant to 29 U.S.C. § 216(b), to remedy defendants' violations of wage and hour provisions of the FLSA.

9.     Because defendants' violations of wage and hour provisions have been willful, the appropriate statute of limitations is three years pursuant to 29 U.S.C. § 255(a).

10.    Because defendants' unlawful conduct is compelled by NCAA bylaws set forth in the NCAA Division I Manual[2] and from which this actual, and recurring, controversy arises, Plaintiff also seeks a declaration that NCAA bylaws, as uniformly interpreted and applied by defendants to prohibit the proper classification of Scholarship Athletes as employees and their compensation on a minimum wage scale, violate wage and hour provisions of the FLSA.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) because this action arises under the FLSA.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Each of the defendants can be found, resides, has an agent, or transacts business in this District, and the unlawful conduct has been, or will be, carried on in part by one or more of the defendants within this District.

13.    The NCAA has entered into multi-year, multi-billion dollar agreements with ESPN, CBS and Turner Sports to broadcast athletic contests between member schools, including broadcasts from and into this District, and the NCAA has distributed, and is to distribute, shares of these broadcasting fees to member schools.

---

[2]    All hyperlinks incorporated by reference, and in blue underlined font, were last visited on September 22, 2017, one business day before filing.

All references to the NCAA Division I Manual, and the bylaws contained therein, are to the *2017-18 Division I – August* edition, which is substantially similar to prior editions applicable to members of the Scholarship Athlete Collective at all relevant times.

-3-

14.     In addition to shares of fees from the NCAA's broadcasting agreements, NCAA member schools receive shares of fees from agreements entered into jointly as part of a conference, or individually, with television and radio networks to broadcast athletic contests between NCAA member schools, including broadcasts from and into this District.

15.     NCAA member schools aim to increase applications from prospective students through promotion of their NCAA athletics programs, and through advertisements during broadcasts of NCAA contests described in Paragraphs 13 and 14, *supra*, including applications from and into this District.

16.     In this decade, the NCAA has conducted, and member schools have participated in, NCAA Division I post-season and championship segments in this District, including:  Men's Basketball (2013 Second and Third Rounds, and 2016 East Regional); Women's Basketball (2011 Regional); Men's Hockey (2014 Championship); Men's Soccer (2013 and 2017 Championships); Men's Lacrosse (2013, 2015 and 2016 Championships); Women's Lacrosse (2015 and 2016 Championships); and Wrestling (2011 Championship). Furthermore, NCAA member schools annually participate in the Penn Relays, the oldest track and field competition in the nation.

17.     Seven NCAA Division I member schools are in this District: Drexel University, La Salle University, Lafayette College, Lehigh University, Saint Joseph's University, Villanova University and Temple University.  Other NCAA member schools compete against the member schools located in this District in the recruitment of Scholarship Athletes residing in this District, and in athletic contests in this District.

www.StudentAthleteEquity.com

18.     NCAA member schools engage in other commercial conduct in this District, including: (i) application pitches to prospective students residing in this District; (ii) collection of application fees, tuition, and room and board from residents of this District; (iii) fundraising appeals to, and collections from, alumni and donors residing in this District; and (iv) in-store and internet sales of collegiate- and NCAA-licensed products in this District.

## THE PARTIES

### PLAINTIFF LAWRENCE "POPPY" LIVERS

19.     Plaintiff Lawrence "Poppy" Livers ("Livers") is an adult individual who resides in King of Prussia, Montgomery County, Pennsylvania.

20.     For reasons set forth in Paragraphs 45 through 179, *infra*, Livers, as a Scholarship Athlete on the Football roster of Villanova University during academic year 2014-15, was a covered employee of the defendants within the meaning of the FLSA, and defendants are jointly liable to Livers for unpaid minimum wages for that period.

21.     Livers has consented to join this action.  His Consent to Join form is attached hereto as Ex. A.

### DEFENDANTS

22.     Livers incorporates by reference the allegations about defendants contained in Paragraphs 13 through 18, *supra*, and 28, *infra*, as though fully set forth.

23.     Defendant NCAA and defendant NCAA member schools, which respective principal offices are identified in Exs. B and C incorporated herein as though fully set forth, are covered employers within the meaning of the FLSA.

24.     At all relevant times, defendants jointly suffered or permitted, and benefitted from, the unpaid labor of Livers and members of the Scholarship Athlete Collective defined in Paragraph 27, *infra*.

www.StudentAthleteEquity.com

25.     At all relevant times, defendants jointly refused, and failed, to properly classify Livers and members of the Scholarship Athlete Collective as employees, and to compensate them on a minimum wage scale, in violation of the FLSA.

26.     Defendants are jointly liable to Livers, and to members of the Scholarship Athlete Collective, for unpaid minimum wages.

## SCHOLARSHIP ATHLETE COLLECTIVE ALLEGATIONS

27.     Livers brings this action for unpaid minimum wages on his own behalf and on behalf of *all* recipients of athletic scholarships under Athletic Financial Aid Agreements requiring them to participate in NCAA athletics at private and semi-public NCAA Division I member schools[3] at any time within the statute of limitations and through the date of the final judgment, or of resolution of any appeal therefrom (the "Scholarship Athlete Collective").

28.     NCAA bylaws are adopted through a legislative process by member schools, and are uniformly interpreted and applied by member schools to insure a "level playing field" under threat of competition and financial penalties issued by the NCAA for failure to comply.

29.     By operation and enforcement of NCAA bylaws, all members of the Scholarship Athlete Collective are subjected to the same policies and practices prohibiting their proper classification as employees and compensation on a minimum wage scale, and restricting unilateral discretion of NCAA member schools to set other terms and conditions of their unpaid labor, including: (i) recruitment (incoming freshmen and college transfers); (ii) eligibility for hire or to participate; (iii) hours of participation supervised by full-time coaching and training staff; (iv) duration of employment or participation; and (v) discipline.

---

[3]     The private and semi-public NCAA Division I member schools identified in Exs. B and C have either **not** asserted, or **not** been granted, *Eleventh Amendment* immunity to suit under federal statutes in other litigation.

30.     For reasons set forth in Paragraphs 146 through 174, *infra*, NCAA bylaws that subject all members of the Scholarship Athlete Collective to the same terms and conditions of unpaid labor also establish their joint employment by defendants.

31.     By operation and enforcement of NCAA bylaws, all members of the Scholarship Athlete Collective have suffered similar injuries and sustained similar damages.

32.     The Scholarship Athlete Collective consists of many similarly situated persons who have not been paid minimum wages by the defendants in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of this action and the opportunity to join.  Those similarly situated collective members are known to defendants, are readily identifiable, and can be located through the defendants' records.  Notice should be sent to members of the Scholarship Athlete Collective pursuant to 29 U.S.C. § 216(b).

## DEFENDANT CLASS ACTION ALLEGATIONS

33.     The 20 NCAA Division I member schools named in this Complaint are individually and collectively representative of a defendant class of private and semi-public NCAA Division I member schools that entered/enter into Athletic Financial Aid Agreements with members of the Scholarship Athlete Collective requiring their participation in NCAA athletics.

34.     The remaining members of the proposed defendant class are identified in Ex. C incorporated herein as though fully set forth.[4]

35.     Each of the 20 NCAA Division I member schools proposed as a defendant class representative is geographically located within boundaries of the U.S. Court of Appeals for the Third Circuit.

---

[4]     If the defendant class is not certified, Livers intends to file an Amended Complaint joining the NCAA member schools identified in Ex. C.

36.     The remaining members of the proposed defendant class are numerous – 97 – and geographically dispersed throughout the nation as far North as Vermont, as far South as Florida, as far West as California, and nearly every state in between.  Fed. R. Civ. P. 23(a)(1).

37.     For reasons set forth in Paragraphs 28 through 31, *supra*, questions of law and fact are common.  Fed. R. Civ. P. 23(a)(2).

38.     In *Berger v. NCAA et al.*, No. 1:14-CV-1710 (S.D. Ind. Mar. 18, 2015) filed on behalf of a broader collective including "walk-ons" **not** on athletic scholarship, the defendants included 115 members of the proposed defendant class here, *plus* eight members of the Ivy League which do **not** offer athletic scholarships.  The NCAA and 123 member schools mounted a joint defense; one law firm represented the NCAA and 90 member schools, and another law firm represented 30 member schools.

39.     For reasons set forth in Paragraphs 28 through 31, and 38, *supra*, the defenses of the 20 NCAA Division I member schools named in this Complaint are typical of the defenses of the proposed defendant class.  Fed. R. Civ. P. 23(a)(3).

40.     The NCAA is the association, representative legislative body, and lobby arm of the more than 1,200 NCAA member conferences and schools.

41.     The 20 NCAA Division I member schools named in this Complaint include three members of the "Power Five" conferences (*e.g.*, Atlantic Coast and Big Ten conferences), one member of the "Group of Five" conferences (*e.g.*, American Athletic conference), two members of the "High-Major" conference (Big East conference), and 14 members of "Mid-Major" conferences (*e.g.*, the Atlantic 10, Colonial, Metro Atlantic Athletic, Northeast and Patriot League conferences).

42.     For reasons set forth in Paragraphs 28 through 31, 38 and 40 through 41, *supra*, the NCAA and 20 NCAA Division I member schools named in this Complaint will fairly and adequately protect the interests of the proposed defendant class.  Fed. R. Civ. P. 23(a)(4).

43.     Because NCAA bylaws define the shared responsibilities and benefits of the joint enterprise of the NCAA and its member schools; are uniformly interpreted and applied by member schools to insure a "level playing field" under threat of competition and financial penalties issued by the NCAA for failure to comply; and compel unlawful conduct complained of, *see* Paragraphs 10, 28 through 31, and 38, *supra*, if any adjudication or resolution were to require any member school(s) to classify and pay Scholarship Athletes as employees, either the member school(s) party to such Order would be expelled from the NCAA or the NCAA and member schools **not** party to such Order would have to also comply.  Thus, the proposed defendant class is appropriate under Fed. R. Civ. P. 23(b)(1) and (b)(2) because:

(1)  prosecuting separate actions against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)  the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that declaratory relief is appropriate respecting the class as a whole.

## FACTUAL ALLEGATIONS

THE SCHOLARSHIP ATHLETE COLLECTIVE

44.     Livers incorporates by reference the allegations contained in Paragraphs 1 through 43, *supra*, as though fully set forth.

45.     Scholarship Athletes enter into Athletic Financial Aid Agreements that are similar in substance to the NCAA sample form agreement on NCAA.org at https://www.ncaa.org/sites/default/files/FinAidForm_0.pdf, attached hereto as Ex. D, and/or subject to NCAA Division I Bylaws Article 15.  Financial Aid.

### Academic and Athletic Scholarships Are Not Compensation

46.     Both academic and athletic scholarships are grants-in-aid designed to assist academically eligible students and/or their families in defraying costs of attendance.

47.     If, and to the extent, an academic or athletic scholarship were to "represent[] payment for teaching, research, or other services required as a condition for receiving the scholarship," the scholarship would be taxable income.  *See* U.S. Department of Treasury, Internal Revenue Service.  Tax Benefits for Education.  IRS Pub. 970. (2016) Chapter 1. Scholarships, Fellowship Grants, Grants, and Tuition Reductions, at 5, 8.

48.     But both academic and athletic scholarships are **not** taxable income as applied to qualified education expenses required for enrollment and attendance, *e.g.*, tuition and fees, and books.  *Id.* at 4-5.

49.     Just as an academic scholarship is **not** compensation to prepare for and/or participate in class, an athletic scholarship is **not** compensation to prepare for and/or participate in NCAA athletics.

www.StudentAthleteEquity.com

50.     The NCAA and member schools have asserted and/or admitted that an athletic scholarship is **not** compensation to prepare for and/or participate in NCAA athletics in legal proceedings under the National Labor Relations Act, 29 U.S.C.§§ 151 *et seq.*, ("NLRA") *see, e.g., In re: Northwestern Univ. and College Athletes Players Ass'n*, Case No. 13-RC-121359 (NLRB), and under the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1-7, 12-27, *see, e.g., In re: NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 4:14-md-02541 (N.D. Cal.).

**By Comparison to Academic Scholarships, Athletic Scholarships Impose Additional, and Unparalleled, Obligations and Limitations on Scholarship Athletes**

51.     Both athletic and academic scholarships require recipients to meet and maintain academic eligibility standards.

52.     But athletic scholarships impose additional, and unparalleled, obligations and limitations on Scholarship Athletes, including but not limited to those set forth in Paragraphs 53 through 87, and 146 through 174, *infra*.

***Scholarship Athletes Are Obligated to Participate in NCAA Athletics That Interfere With, Rather Than Facilitate, Academic Studies***

53.     An athletic scholarship obligates a Scholarship Athlete to participate in NCAA athletics as directed, and controlled, by coaching and training staff, athletics department personnel, and NCAA compliance officers employed by member schools for the express and full-time purpose of supervising Scholarship Athletes (hereinafter, collectively "NCAA athletics supervisory staff").

54.     In contrast to an academic scholarship, an athletic scholarship's requirement that a Scholarship Athlete participate in NCAA athletics interferes with, rather than facilitates, academic studies.

-11-

55.     The NCAA and member schools admit that "time required of student athletes for participation in intercollegiate athletics [must] be regulated to minimize interference with their opportunities for acquiring a quality education in a manner consistent with that afforded the general student body." NCAA Division I Constitution Article 2.14.

56.     The NCAA and member schools purport to regulate athletic participation to minimize interference with academic studies through NCAA bylaws: (i) limiting class time missed; (ii) limiting hours of athletic activities supervised by coaching staff to 20 hours per week in playing and practice season and 8 hours per week in off-season; and (iii) requiring NCAA athletics supervisory staff to record the hours of athletic participation on **timesheets** the same as work study supervisors are required to record the hours of student employment. NCAA Division I Bylaws 17.1.7.1; 17.1.7.2; 17.1.7.3.4; 17.1.7.9.1; and 17.1.7.9.2; *also see, e.g.,* U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, 6-43, 6-46, 6-48 (regarding similar work study guidelines to minimize interference with academic studies).

57.     But, the NCAA *Growth, Opportunities, Aspirations and Learning of Students (GOALS) Study* (2015) suggests NCAA regulation of athletic participation to minimize interference with academic studies is ineffectual and/or for appearances.  In NCAA Division I:

- the medians of student athlete reported hours spent per week on athletic activities demonstrate a **full-time** commitment to NCAA athletics that is considerably more than the (maximum) 20 hour per week, **part-time** commitment of students employed in work study programs:

     Football Bowl Subdivision | 42 hrs./week

     Football Championship Subdivision | 41 hrs./week

     Men's Basketball | 34 hrs./week

     Women's Basketball | 35 hrs./week

     Baseball | 40 hrs./week

     All Other Men's Sports | 32 hrs./week

     All Other Women's Sports | 32 hrs./week

- a considerable percentage of student athletes reported that participation in NCAA athletics prevented them from majoring in what they really wanted:

  Football Bowl Subdivision | 36%

  Football Championship Subdivision | 28%

  Men's Basketball | 29%

  Women's Basketball | 32%

  Baseball | 32%

  All Other Men's Sports | 23%

  All Other Women's Sports | 25%

- a considerable percentage of student athletes reported that participation in NCAA athletics prevented them from taking classes they wanted to take:

  Football Bowl Subdivision | 50%

  Football Championship Subdivision | 42%

  Men's Basketball | 34%

  Women's Basketball | 51%

  Baseball | 41%

  All Other Men's Sports | 48%

  All Other Women's Sports | 53%

- a considerable percentage of student athletes reported that they felt less than positive about their ability to keep up with classes in playing and practice season:

  Football Bowl Subdivision | 40%

  Football Championship Subdivision | 45%

  Men's Basketball | 38%

  Women's Basketball | 44%

  Baseball | 44%

  All Other Men's Sports | 40%

  All Other Women's Sports | 39%

58.     Student athlete time commitment findings in the 2015 NCAA *GOALS Study*
are consistent with former Northwestern University quarterback Theodis Kain Colter's
testimony in *In re Northwestern Univ. and College Athletes Players Ass'n*, Case No.
13-RC-121359, NLRB Transcript, Feb. 18, 2014 ("Colter Test.") on NLRB.gov at
http://apps.nlrb.gov/link/document.aspx/09031d4581603b6a:

> Everything that we do is scheduled around football, what
> classes we can take, what major you could really participate in.
> It's all depending on football and your schedule ….
>
> *****
>
> Due to the time demands, you can't ever reach your academic
> potential.  You're merely just surviving.  There's so much time
> demand towards football and being a great football player that
> you have to sacrifice one, and we're not allowed to sacrifice
> football.  So ….

*See* Colter Test. 166:14-170:19.

59.     Colter further testified:

> Q:  But in your experience, you then switched from the premed
>      and just did the psychology major?
>
> A:  Yeah. I realized that I was going to kill myself if I was,
>      you know, trying to do all this and put this many hours into,
>      you know, football and then try to fill in the premed stuff.
>      So I decided that, you know, if I was going to finish it, I would
>      do it with a post-back year once I was gone.
>
> Q:  Why didn't you just let the football work slack off and focus
>      on the studies?
>
> A:  If I slack off with the football work, if I don't attend the
>      games, or if I don't attend summer practice or anything like
>      that, I'm not going to have that scholarship.

*Id*. at 187:6-20.

60.     The extraordinary taxation and rigidity of Scholarship Athlete's schedules are exemplified by the 15-hour daily schedule that Florida lays out for its football players during playing and practice season.  Reporting about a June 8, 2015 tweet from Florida head coach Jim McElwain – "All Gators, All Day.  Here's an inside look at a typical day for our players. #NoTimeToLose #GoGators" – SBNation observed:

> Here's that itinerary, stripped of the bright colors and ads:
>
> - 6:00 – 7:00 a.m.:     Wake up
> - 7:00 – 7:45 a.m.:     Eat breakfast
> - 8:00 – 11:30 a.m.:   Class
> - 12:00 – 12:30 p.m.: Eat lunch
> - 12:30 – 1:30 p.m.:   Lift
> - 1:30 – 2:30 p.m.:     Fuel and recover
> - 2:30 – 3:30 p.m.:     Meetings
> - 3:30 – 5:30 p.m.:     Practice
> - 6:00 – 6:30 p.m.:     Fuel and recover
> - 6:30 – 7:00 p.m.:     Eat
> - 7:30 – 9:00 p.m.:     Study
>
> Savor those 30-minute breaks between the end of class and lunch and the end of dinner and study hall, kids:  They're all you're going to get ….
>
> [W]e rarely get as clear a delineation of the extraordinary effort put forth by "student-athletes" to play sports (and to be college students) ….
>
> For a Florida football player, waking up at 6 a.m. is a fact of life.  So is a three-hour block of classes beginning at 8 a.m. that was plotted out by advisors.  So is spending four hours of every afternoon on mandatory football duties – the maximum allowed to be mandated by the NCAA in season, though extra work is always encouraged and typically praised – and so is the hour and a half of studying after the completion of a 13-hour day.

-15-

**This schedule is a work schedule.**  The work done by "student-athletes" is hard work.  There is "no time to lose," of course, because inefficiency is the bane of businesses.

Andy Hutchins, "Florida details football players' 15-hour days with daily schedule graphic," SB Nation, June 9, 2015.  (emphasis supplied)

61.    In response to student athlete time commitment findings in the 2015 NCAA *GOALS Study*, the "Power Five," *i.e.*, Atlantic Coast, Big 12, Big Ten, Pacific-12 and Southeastern conferences, approved measures during the 2017 NCAA Convention aimed at helping student athletes have more discretionary time starting the 2017-18 academic year, including: (i) requiring annual time management plans for each sport; (ii) prohibiting athletically related activities during a continuous 8 hour period between 9 p.m. and 6 a.m.; and (iii) requiring a 7 day break after a season and 14 more days off during the academic year. Other NCAA Division I member conferences and/or schools can decide individually whether to adopt these proposals.  *See* Michelle Brutlag Hosick, "DI student-athletes to have more time away from sports," NCAA.org, Jan. 20, 2017; NCAA Division I Bylaws 17.1.7.8; 17.1.7.9.6; 17.1.7.9.7; and 17.1.8 (*Adopted: 1/20/17 effective 8/1/17).*

62.    Regarding the student athlete discretionary time measures referenced in Paragraph 61, *supra*, NCAA Convention attendee and former Oklahoma offensive lineman Ty Darlington remarked: **"Coaches need to understand that student-athletes aren't on call at all times."**  Brutlag Hosick, "DI student-athletes to have more time away from sports."  (emphasis supplied)

63.    If injury or illness prevents a Scholarship Athlete from participating in NCAA athletics, the Athletic Financial Aid Agreement obligates him/her to "assist the athletics department in other operational activities (*i.e.*, coaching and/or support staff duties)," as directed, and controlled, by NCAA athletics supervisory staff.  *See* Ex. D.

### *Scholarship Athletes Are Prohibited from Earning Fungible Pay That Can Be Spent on Living Expenses Not Covered by Scholarship*

64.     Scholarship Athletes are **neither** paid for participation in NCAA athletics **nor** paid for performing the operational activities in the athletics department referenced in Paragraph 63, *supra.*

65.     By contrast to Scholarship Athletes, academic scholarship recipients participating in work study programs are paid on a minimum wage scale for supplementing operational activities in campus departments and offices, libraries, dining halls, facilities and stores.

66.     In fact, through work study, academic scholarship recipients can be, and are, paid minimum wages for performing operational activities in the athletics department and/or at NCAA contests, *e.g.*, student ticket takers, seating attendants and food concession workers.

67.     Furthermore, because Scholarship Athletes are additionally obligated to participate in arduous and time-consuming NCAA athletics, *see, e.g.*, Paragraphs 52 through 63, *supra,* Scholarship Athletes do **not** have "free time," that academic scholarship recipients have, to apply for, and accept, work study positions in order to earn fungible pay that can be spent on living expenses not covered by academic or athletic scholarships.  *See* Paragraph 48, *supra.*

68.     Indeed, because Scholarship Athletes are additionally obligated to participate in arduous and time-consuming NCAA athletics, Scholarship Athletes may **not** even be *allowed* to apply for, or accept, work study positions by NCAA athletics supervisory staff in order to comply with NCAA progress-toward-degree requirements, *see, e.g.*, NCAA Division I Bylaw 14.4, and/or by work study supervisors in order to comply with work study guidelines

www.StudentAthleteEquity.com

limiting work based on, "how the combination of work and study hours will affect the student's health and academic progress." *See, e.g.*, U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, 6-46.

69.     If a Scholarship Athlete attempts to earn fungible pay that can be spent on living expenses not covered by his/her scholarship, or to obtain a discount on living expenses, by "trading" on his/her athletics reputation, he/she runs afoul of NCAA bylaws prohibiting compensation and faces suspension or termination of eligibility.  *See, e.g.*, NCAA Division I Bylaws 12.1.2.1.6, 12.4.1.1 and 12.4.2.3; *also* suspensions of former Georgia running back Todd Gurley (four games for accepting $3,000 to autograph memorabilia over two years; Mark Schlabach, "NCAA denies UGA's Gurley appeal," ESPN.com, Oct. 30, 2014) and former Ohio State quarterback Terrelle Pryor (five games for selling $2,500 in memorabilia, and accepting discounts from a tattoo parlor; "Ohio State football players sanctioned," ESPN.com, Dec. 26, 2010).

### *Scholarship Athletes Are Subject to Far Stricter Discretionary Control of Student Performance and Conduct by College Supervisory Staff*

70.     The NCAA imposes strict annual limits on the total number and value (equivalencies) of athletic scholarships per sport.  *See* NCAA Division I Bylaw 15.5.

71.     For example, for academic year 2017-18, the Football Bowl Subdivision could have offered a total of 85 full scholarships, the Football Championship Subdivision a combined total of 85 full and partial scholarships summing up in value to an equivalency of 63 full scholarships, and Men's Soccer combined full and partial scholarships summing up in value to an equivalency of 9.9 full scholarships.  *Id*.

72.     For academic year 2017-18, the NCAA athletic scholarship limitations by sport are:

### Head-Count Sports

Football Bowl Subdivision | 85.0

Football Championship Subdivision | 85.0 (63.0 equivalency)

Men's Basketball | 13.0

Women's Basketball | 15.0

Baseball | 27.0 (11.7 equivalency)

Men's Ice Hockey | 30.0 (18.0 equivalency)

Women's Ice Hockey | 30.0 (18.0 equivalency)

Women's Gymnastics | 12.0

Women's Tennis | 8.0

Women's Volleyball | 12.0

| Men's Equivalency Sports | Women's Equivalency Sports |
|---|---|
| Cross Country/Track and Field | 12.6 | Bowling | 5.0 |
| Fencing | 4.5 | Cross Country/Track and Field | 18.0 |
| Golf | 4.5 | Equestrian | 15.0 |
| Gymnastics | 6.3 | Fencing | 5.0 |
| Lacrosse | 12.6 | Field Hockey | 12.0 |
| Rifle | 3.6 | Golf | 6.0 |
| Skiing | 6.3 | Lacrosse | 12.0 |
| Soccer | 9.9 | Rowing | 20.0 |
| Swimming and Diving | 9.9 | Rugby | 12.0 |
| Tennis | 4.5 | Skiing | 7.0 |
| Volleyball | 4.5 | Soccer | 14.0 |
| Water Polo | 4.5 | Softball | 12.0 |
| Wrestling | 9.9 | Swimming and Diving | 14.0 |
| | Triathlon | 6.5 |
| | Water Polo | 8.0 |

*Id.*

www.StudentAthleteEquity.com

73.     NCAA athletic scholarship limitations are by academic year, **not** academic classification, meaning a freshman, sophomore or junior Scholarship Athlete could see his/her scholarship reduced or cancelled for the coming academic year to make scholarship "cap room" for an incoming freshman or college transfer.

74.     In fact, most athletic scholarships are "given initially for up to one year" and "can be renewed, reduced, increased or canceled from year to year **for almost any reason**" by NCAA athletics supervisory staff.  *See* Financial Aid Information on NCAA.org at http://fs.ncaa.org/Docs/eligibility_center/Athletics_Information/FinancialAid.pdf (emphasis supplied), attached hereto as Ex. E; *also* Scholarships on NCAA.org at http://www.ncaa.org/student-athletes/future/scholarships.

75.     By contrast to athletic scholarships, most, if not all, academic scholarships are allotted by academic classification, meaning a recipient retains the scholarship through graduation so long as he/she continues to meet and maintain academic eligibility standards, *alone*, and a recipient is **not** subjected to arbitrary reduction or cancellation from year to year.

76.     Both academic and athletic scholarships can be cancelled early if the recipient becomes academically ineligible, engages in fraud or serious misconduct, or withdraws from the program to which the scholarship applies.

77.     But, again, athletic scholarships impose additional, and unparalleled, obligations and limitations on Scholarship Athletes, *also* permitting early cancellation or reduction under the Athletic Financial Aid Agreement when the Scholarship Athlete:

- "renders himself/herself ineligible for intercollegiate competition," *i.e.*, is suspected, deemed or determined to have run afoul of any of the myriad of bylaws set forth in the 415-page NCAA Division I Manual and/or interpretations of bylaw infractions reported in the NCAA Legislative Services Database, published by the NCAA at https://web3.ncaa.org/lsdbi/;

- engages in "manifest disobedience," *i.e.*, is suspected, deemed or determined to have run afoul of, "[r]ules and regulations of the Department of Intercollegiate Athletics and specific rules of the recipient's sport as defined by the head coach as they apply;"

- "[f]ails to attend ... squad or individuals meetings ... and participate in athletic practice sessions and scheduled contests, as specified by the sport coach;"

- "[d]oes not comply with expected personal conduct, appearance and dress, both on and off the University campus ... when such violations bring discredit to the athletic program;" or

- "[f]ails to adhere to training rules and regulations."

*See* Ex. D; *also* NCAA Division I Bylaws 15.3.4.2 and 15.3.5.1.

78.     By operation of the Athletic Financial Aid Agreement, and/or similar obligations and limitations imposed on Scholarship Athletes under NCAA bylaws, NCAA athletics supervisory staff exercise extraordinary discretionary control over **required participation in NCAA athletics** under threat of athletic scholarship reduction or cancellation for failure to submit to their discretionary control.

79.     By operation of the Athletic Financial Aid Agreement, and/or similar obligations and limitations imposed on Scholarship Athletes under NCAA bylaws, NCAA athletics supervisory staff *also* exercise extraordinary discretionary control over **personal, and otherwise permissible, conduct** under threat of athletic scholarship reduction or cancellation for failure to submit to their discretionary control.

80.     Former Northwestern quarterback Theodis Kain Colter testified before the NLRB that NCAA and Northwestern athletics department policies imposed limitations on the personal conduct of student athletes, *which were inapplicable to other students*, regarding: (i) speech and use of social networks and media; (ii) dress; (iii) residential leasing agreements; (iv) automobile leasing or purchase agreements; and (v) separate employment on or off campus.  Colter Test. 150:11-155:19, 161:21-162:16, 163:21-164:6, 192:19-193:11.

-21-

81.     Colter further testified that failure to submit to discretionary control of NCAA athletics supervisory staff could result in sanctions, including, but not limited to, "'public or private reprimands, suspension from practice or competition, dismissal from the program, and loss of athletic aid if applicable.'"  *Id*. at 164:15-165:14.

82.     In a subsequent inquiry into Northwestern athletics department policies, the NLRB concluded that limitations on student athlete speech and use of social networks and media, referenced by Colter, constituted unfair labor practices.  The NLRB did not issue a complaint because Northwestern modified, or rescinded, the unlawful policies and sent student athletes notice setting forth the rights of employees under the NLRA.  *See* NLRB Advice Memo Re: Northwestern University, Case 13-CA-157467, Sept. 22, 2016, attached hereto as Ex. F; *also* Lester Munson, "Free to Tweet: Northwestern's restrictions on football players ruled unlawful," ESPN.com, Oct. 10, 2016, attached hereto as Ex. G.

83.     For reasons set forth in Paragraphs 52 through 82, *supra*, Scholarship Athletes are subject to far stricter discretionary control of student performance and conduct by college supervisory staff than academic scholarship recipients.

### *Scholarship Athletes Are Subject to Far Stricter Discretionary Control of Student Options to Transfer by College Supervisory Staff*

84.     If a Scholarship Athlete desires to transfer, he/she may be blocked from receiving an athletic scholarship to attend his/her transfer college of choice. NCAA Division I Bylaws 13.1.1.3 and 14.5.5.  If a Scholarship Athlete does transfer, he/she ordinarily cannot participate in NCAA athletics for a full academic year. NCAA Division I Bylaw 14.5.5.1.

85.     In 2013, The New York Times described the saga of former Oklahoma State quarterback Wes Lunt, who decided he wanted to transfer after losing his starting position in the aftermath of a knee injury and a concussion:

[T]he transfer process started, producing the latest and perhaps an extreme example of what is occurring throughout the country this time of year as many college athletes try to move to different universities.

**The Oklahoma State coach, Mike Gundy, ruled out nearly 40 universities as transfer options for quarterback Wes Lunt, an apparent show of gamesmanship and punishment toward a college athlete who wanted to take his skills elsewhere.**

The forces at work were not new, but Gundy, like a growing number of coaches, chose to harness them to eliminate many, if not all, of Lunt's preferred options and to keep a potential rival from gaining the services of a highly regarded quarterback entering his sophomore season.  It was a powerful illustration of the big-business mind-set of college sports and the control that coaches have over players.

*****

Coaches cannot fully prevent athletes like Lunt from transferring to any university they want.  **But if a coach does not grant an athlete a release, the player must forfeit any scholarship opportunity, pay his own way to the new university and sit out the next season.**  Meanwhile, Gundy, whose contract pays him $30.3 million over eight years, and other coaches can routinely move from one college to another with minimal consequence, often for bigger contracts after arranging a buyout with the first college.

Greg Bishop, "Want to Play at a Different College?  O.K., but Not There or There," N.Y. Times, June 7, 2013. (emphasis supplied)  In the end, Oklahoma State released Lunt to transfer to the University of Illinois.

86.     In 2017, ESPN described similar transfer sagas of former University of Pittsburgh shooting guard Cameron Johnson, initially blocked from transferring to any other member school of the Atlantic Coast Conference or school on Pitt's basketball schedule for academic year 2017-18 (released in June 2017 to transfer to North Carolina) and former Kansas State wide receiver Corey Sutton, initially blocked from transferring to any of 35 schools on his preferred list (released in June 2017 to transfer to Appalachian State).

ESPN observed:

> [H]ow can any institution complain when a student decides to leave the school to pursue his or her education elsewhere? Whether on scholarship or not, there is no restriction for any non-athlete student leaving one school and attending another and being able to receive aid or participate in any extracurricular activity.
>
> Yet, with athletes (and only athletes), the school the athlete is leaving has the power to limit to where an athlete can transfer and receive aid and participate in varsity athletics. **That is the equivalent of a "noncompete" provision in an employment contract.  If not employees, how can NCAA rules allow any school to restrict the choice and movement of any student?**

Jay Bilas, "Cameron Johnson is the perfect example of the transfer rule gone wrong," ESPN.com, June 13, 2017. (emphasis supplied)

87.     In contrast to Scholarship Athletes, **no** other student desiring to transfer may be blocked from receiving any scholarship, or from participating in any programs, at his/her transfer college of choice.

### Under the FLSA, Scholarship Athletes Are Employees As Much As, and Arguably More Than, Students Employed by NCAA Member Schools in Work Study Programs

88.     Similar to students employed in work study programs, Scholarship Athletes' performance outside the classroom is: (i) non-academic in nature; (ii) unrelated/irrelevant to an academic degree program; (iii) not for academic credit; and (iv) supposed to be restricted to 20 hours per week, recorded on **timesheets** maintained by college supervisory staff, to limit interference with academic studies.  *See, e.g.*, Paragraphs 55 and 56, *supra*, and U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, 6-43, 6-46, 6-48.

89.     But, Scholarship Athletes' participation in NCAA athletics is more arduous and rigorous, more time-consuming, and more detrimental to academic studies, than student employment in work study jobs.  *See, e.g.*, Paragraphs 57 through 62, *supra*.

-24-

90. Similar to students employed in work study programs, Scholarship Athletes' performance primarily benefits the NCAA member school, and provides no *comparable* academic or learning benefit to the student.

91. For example, NCAA member schools rely upon students employed in work study programs to *supplement* operational activities in campus departments and offices, libraries, dining halls, facilities and stores.

92. By contrast to students employed in work study programs *supplementing* operational activities, NCAA member school reliance upon Scholarship Athletes in the business of sports is near total as it is Scholarship Athletes' performance that is marketed and sold to consumers as a sports product.

93. In addition, as set forth in Paragraphs 102 through 126, *infra*, revenue generated by NCAA athletics, and benefits from NCAA athletics exposure and promotion that can increase prospective student applications and help fundraising at member schools, far exceed any revenue generated by, or benefits related to, work study programs.

94. Furthermore, for reasons set forth in Paragraphs 52 through 87, *supra*, and 146 through 174, *infra*, Scholarship Athletes are also subject to far stricter discretionary control of student performance and conduct by college supervisory staff than students in work study. NCAA athletics supervisory staff control and direct Scholarship Athletes' performance, both as to the result to be achieved and details by which that result is achieved, far more so than work study supervisors vis-à-vis their student employees.

www.StudentAthleteEquity.com

**In Contrast to Scholarship Athletes and Students in Work Study Programs, Members of Student-Run Groups Are Not Employees under the FLSA**

95.     In contrast to Scholarship Athletes and students in work study programs, members of student-run groups – *e.g.*, dramatics, publications, glee clubs, bands, choirs, debate, radio stations, intramural sports, and interscholastic club sports – are **not** employees of NCAA member schools for reasons set forth in Paragraphs 96 through 101, *infra*.

96.     NCAA member schools exercise insufficient control over student-run groups to create an employer-employee relationship because, by definition, students are solely or principally responsible for student-run group leadership, organization and decision-making. If there is any faculty involvement – *and in most student-run groups there is none* – it is in an advisory capacity, **not** supervisory, and is an off- or extra-duty, **not** a full-time duty.

97.     In contrast to NCAA athletics and work study programs, hours of participation in student-run groups are **not** recorded on **timesheets** maintained by supervising staff of the NCAA member school.

98.     For reasons set forth in Paragraphs 52 through 87, and 96 through 97, *supra*, and 146 through 174, *infra*, Scholarship Athletes are subject to far stricter discretionary control of student performance and conduct by college supervisory staff than members of student-run groups.

99.     In contrast to NCAA athletics and work study programs, student-run groups such as dramatics, publications, glee clubs, bands, choirs, debate, and radio stations are often related/relevant to an academic degree program and/or eligible for academic credit.

100.     Furthermore, NCAA member schools describe student-run group leadership, organization and decision-making in **intramural sports and interscholastic club sports** as educational experiences distinctly different from NCAA athletics.  For example:

www.StudentAthleteEquity.com

**Lafayette College**

>   Sports clubs at Lafayette are student-initiated and student-run organizations that depend on a membership. Members are fully involved in the club's leadership, decision-making, and organization. Each club has been founded and is governed by the executive board of that particular club.

>   *See* Sports Clubs on Lafayette.edu at https://recreation.lafayette.edu/sportsclubs/.

>   Varsity sports [*i.e.*, NCAA athletics] are sponsored by the College and funded through the operating budget, NCAA funding, revenue generated through various events, and gifts from generous donors. Sports clubs are not sponsored by the college, but by Student Government in response to student interest and initiative.  The primary sources of funding for sports clubs are student activity fees (distributed at the discretion of Student Government), sport club member dues, fundraising activities, and gifts from generous donors.

>   Unlike varsity sports, sport clubs are student-run organizations who decide for themselves their level of competitiveness, whether or not they will hire a coach or instructor, how often they will practice, and if they will continue to exist at all …. [Sport clubs] participate in competitions with clubs from other institutions (in many cases as a member of a specific league), and others enter a variety of weekend tournaments.

>   *See* Sport Clubs Frequently Asked Questions on Lafayette.edu at http://recreation.lafayette.edu/sport-clubs-faqs/.

**Lehigh University**

>   [T]he intention is to offer club competition at the highest level and student commitment, including expanded practice and extramural competitions on a regular and formal basis within the club sport model ….  The primary differences between Club Sports and Varsity Intercollegiate Sports [*i.e.*, NCAA athletics] are the funding sources associated with participation and the wide range of commitment levels regarding time and competitiveness. At the intercollegiate level, the institution has made the commitment to sponsor the sport under NCAA and Patriot League Division I guidelines. A Club Sport is one that is initiated and must be sustained by student interest. The club is self-directed under the Club Sports guidelines with a combination of resources from student senate funds, dues and/or their own fundraising initiatives.

www.StudentAthleteEquity.com

> *See* Club Sports-Competitive Levels (Club Varsity) on LehighSports.com at http://www.lehighsports.com/sports/2013/6/3/GEN_0603134752.aspx?id=3.

**Seton Hall University**

> [Club sports] practice regularly and participate in extramural competition …. [but] should not be mistaken for [NCAA] sports that are also supported by the department.  In a club, the members assume the financial responsibilities and assist in organization. There are no athletic scholarships available for club sport participants.

> *See* Club Sports on SHUPirates.com at http://www.shupirates.com/sports/2016/7/10/recreation-seha-club-sports-html.aspx.

> Students in each club are responsible for the internal organization and conduct of their club …. **The management and organization of a club sport is an educational experience providing many challenges for students, such as: writing their constitution and by-laws, conducting club meetings, establishing dues to offset club expenditures, planning fund raising projects, coordinating practices, competition and special events, publicizing club events ….**

> *See* Club Sport Manual, at 1, on SHUPirates.com at http://www.shupirates.com/documents/2016/7/14//club%20sport%20manual%202011%20final.pdf?id=2336.  (emphasis supplied)

**Saint Joseph's University**

> Voluntarily organized by students, club sports exist for the purpose of furthering a common interest in a physical activity …. Students elect their own officers, draft their own constitution, request facility space, get approval for and make travel arrangements, schedule contests with other teams, develop contracts with officials, fundraise and manage their budget.

> *See* Club Sports on SJU.edu at https://sites.sju.edu/recreation/club-sports/.

(Another member school in the defendant class, Mount St. Mary's University, explains that, "running a club sports team is a lot like running your own business."  *See* Club Sports on MSMary.edu at http://msmary.edu/student-life/recreation/club-sports/.)

101.    The New York Times similarly described student-run, interscholastic club sports and differentiated them from NCAA athletics:

> In intercollegiate club sports, there are no athletic scholarships, no adoring crowds and minimal adult leadership.
>
> Institutional financing is meager and hard work abundant, with dozens of volunteer hours required from the athletes just to put on a single game or match.
>
> It's college athletics without the pageantry or prerogative, and that's the way athletes in club sports like it.  They devise the practices, make the team rules, decide whom to play and when, raise the money for uniforms and game officials, schedule the hotel and travel arrangements and manage the paperwork.
>
> "It's a ton of work, but we do it because we take ownership of our team," said David Gerstle, the player-coach of Yale's club water polo team, which like most club teams operates largely outside the purview of the university athletic department ….
>
> *****
>
> An estimated two million college students play competitive club sports compared with about 430,000 involved in athletics governed by the National Collegiate Athletic Association and the National Association of Intercollegiate Athletics.
>
> The less restrictive nature of club teams has also been a magnet for the thriving nontraditional sports market …. [C]lub teams are competing for national championships in bass fishing, ballroom dancing and Brazilian martial arts.
>
> Because of this independent and inclusive spirit, competitive club sports have emerged as an alternative to the semiprofessional, regulated, commercial environment of modern, elite college athletics ….
>
> *****
>
> The ability to balance one's academic, athletic and social life is an apparent draw to the club sports model.  Chip Spear, a volunteer coach for the Yale water polo team, said that one of his players was a member of the Whiffenpoofs, Yale's celebrated a cappella group.
>
> "He misses some practices for their engagements," said Spear, who played water polo at Yale when it was still a varsity sport. "The team works it out because all practices are not mandatory. I'm not sure how that would have worked on a varsity team."

www.StudentAthleteEquity.com

> Students say they sometimes choose a club sport (like sailing) for cultural or lifestyle reasons or because it was not available in high school (like Ultimate Frisbee).
>
> In either case, the students shape and influence the makeup and philosophy of the team, and tailor their commitment to it.
>
> College administrators said they put club sports in the same category as student development.

Bill Pennington, "Rise of College Club Teams Creates a Whole New Level of Success," N.Y. Times, Dec. 2, 2008.

### Under the FLSA, Revenue-Generation Is Not Required to Meet Criteria for Employee Status and Compensation

102.    Any performance that brings in money to an operation is "revenue-generating."

103.    For example, revenue-generation includes, but is not limited to, performance that: (i) is marketed and sold to consumers as a product; (ii) sells a product; (iii) supports fundraising; or (iv) collects indebted monies.

104.    Under the FLSA, a person is **not** required to engage in revenue-generating performance, individually or as part of a business unit, in order to meet criteria for employee status and compensation.

105.    In fact, several persons accepted, and treated, as college employees generate **no**, or *de minimis*, revenue, including but not limited to: (i) students in work study programs, and college support staff, performing operational activities in campus departments and offices, libraries, dining halls and facilities (as opposed to sales, fundraising and collection activities); and (ii) college staff in "cost centers," *i.e.*, departments costing or spending money, without bringing money in, such as human resources, facilities and grounds maintenance, public safety, information technology, records management, purchasing, accounting and legal counsel.

*While Revenue-Generation Is Not Required under the FLSA,*
*Athletic Performance Is the Sine Qua Non of the Business of Sports*

106.    In NCAA athletics, and professional sports, athletes are revenue-generating because it is their athletic performance that is marketed and sold to consumers as a sports product.

107.    By contrast to athletes, most coaches, training staff and team administrative personnel generate **no**, or considerably less, revenue from their performance.

108.    Consumers attend and/or tune into athletic contests first, and foremost, to see/hear players play – **not** coaches coach (or trainers train, general manager manage *etc.*).

109.    The performance of athletes, *i.e.*, the sports product, is the *sine qua non* of the business of sports; without athletic performance, there would be **no** revenue and **no** employment of coaches, training staff and team administrative personnel.

110.    Athletes also generate revenue as the sellers of the sports product through their indispensable role in sports promotion, including but not limited to: (i) use of their names, images and likenesses in advertising; (ii) interaction with the community of sports consumers; (iii) interaction with the community of sports donors; and (iv) interaction with sports broadcasters and media.

111.    By contrast to athletes, only select members of the coaching and training staff (*e.g.*, the head coach, and perhaps top assistants) and team administrative personnel (*e.g.*, the general manager or athletic director, and marketing and media staff) sell the sports product through a role in sports promotion.

112.    For reasons set forth in Paragraphs 106 through 111, *supra*, in professional sports, most athletes are paid more than coaches, training staff and team administrative personnel.

www.StudentAthleteEquity.com

113.     In NCAA *Division I Revenues and Expenses (2004-2015)*, member schools reported that, in Fiscal Year 2015, median total salaries and benefits for NCAA athletics supervisory staff were as follows:

> **Private Member Schools**
> **competing in the Football Bowl Subdivision**
> $25,681,000
>
> **Private Member Schools**
> **competing in the Football Championship Subdivision**
> $ 6,448,000
>
> **Private Member Schools not competing in Football**
> $ 4,976,000

114.     In contrast to NCAA athletics supervisory staff, the Scholarship Athletes generating revenue as described in Paragraphs 106 through 111, *supra*, and 118 through 126, *infra*, are **not** paid.

115.     Scholarship Athletes are **not** even paid on a minimum wage scale comparable to students employed at NCAA contests in work study; without Scholarship Athletes' performance, there would be **no** work study employment of students as ticket takers, seating attendants and food concession workers at NCAA contests.

### *Degree of Profitability Neither Determines Nor Discharges Duties to Properly Classify and Compensate Employees under the FLSA*

116.     Subtracting operating expenses (*e.g.*, the total salary and benefits for NCAA athletics supervisory staff) from revenue (*e.g.*, the revenue from marketing the athletic performance of Scholarship Athletes) provides a base number for profit. *See, e.g.*, What is revenue generation? | Reference.com at https://www.reference.com/business-finance/revenue-generation-ecb3c7fc6ece825f.

-32-

117.    The Washington Post examined the profitability of NCAA athletics in a series of investigative reports, including:

- Will Hobson and Steven Rich, "Playing in the Red," The Washington Post, Nov. 23, 2015.

- Will Hobson and Steven Rich, "College sports' fastest-rising expense: Paying coaches not to work," The Washington Post, Dec. 11, 2015 (regarding multi-year, 6-and 7-figure coaching severance packages).

- Will Hobson and Steven Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf." The Washington Post, Dec. 15, 2015.

118.    The Washington Post found, "college sports departments are making more money than ever before, thanks to skyrocketing television contracts, endorsement and licensing deals, and big-spending donors." *See* Hobson and Rich, "Playing in the Red."

119.    In NCAA Division I, Scholarship Athletes in each and every NCAA sport generate revenue for the NCAA and member schools mostly through shared and individual broadcasting rights fees from national networks (*e.g.*, ABC, ESPN, ESPN2, ESPNU, ESPN3, Fox Sports 1, Fox College Sports, CBS, CBS Sports Network, and NBC), member conference-affiliated networks, and regional networks.

120.    Broadcasting rights fees are typically broken down into tiers:

> First-tier rights are for football and/or basketball games broadcast nationally. Second-tier rights are for football and/or basketball games not selected by the first-tier rights holder. Third-tier rights are any games not selected by the first or second-tier rights holders and rights for all sports other than football and basketball.

Kristi Dosh, "Television Contract Breakdown," BusinessofCollegeSports.com, May 5, 2011.

121.    The Football Bowl Subdivision and Men's Basketball generate the highest broadcasting rights fees for Championships, *e.g.*, ESPN's 12-year, $7.3 billion contract for the College Football Playoff Semifinals and Championship, plus three bowls in the playoff format, and CBS and Turner Sports' 22-year, $19.6 billion contract for March Madness.

www.StudentAthleteEquity.com

122.    Substantial broadcasting rights fees generated from regular season contests in the Football Bowl Subdivision and Men's Basketball on national, conference-affiliated, and regional networks are not readily ascertainable and may be bundled as part of First-, Second-, or Third-tier rights; upon information and belief, all contracts are in the possession of the NCAA, member conferences, and/or member schools, and/or broadcasting and media partners subject to subpoena.

123.    NCAA sports other than the Football Bowl Subdivision and Men's Basketball also generate broadcasting rights fees for Championships, notably Women's Basketball, Baseball and Softball but also all other NCAA sports, *e.g.*, ESPN's 11-year, $500 million contract for 600-plus hours and 300 telecasts of Championships in all NCAA sports other than the Football Bowl Subdivision Playoff and Men's Basketball March Madness.

124.    Substantial broadcasting rights fees generated from regular season contests in all sports other than the Football Bowl Subdivision and Men's Basketball on national, conference-affiliated, and regional networks are not readily ascertainable and may be bundled as part of Third-tier rights (*see, e.g.*, Dosh, "Television Contract Breakdown," noting "[d]eals for third-tier rights are too cumbersome to cover"); upon information and belief, all contracts are in the possession of the NCAA, member conferences, and/or member schools, and/or broadcasting and media partners subject to subpoena.

125.    The Washington Post also reported that, according to athletic directors, NCAA athletics "benefit universities in ways that don't show on athletics financial statements … like media exposure that can cause increased applicants and help fundraising."  *See* Hobson and Rich, "Playing in the Red."

www.StudentAthleteEquity.com

126.    Substantial revenues generated by all NCAA sports, reflected and recorded in financial statements of departments other than athletics, *e.g.*, admissions or fundraising, are not readily ascertainable; upon information and belief, all relevant records are in the possession of the NCAA, member conferences, and/or member schools.

127.    In spite of "skyrocketing television contracts, endorsement and licensing deals, and big-spending donors," The Washington Post reported most athletics departments *claim* not to be profitable "as athletic directors **choose** to outspend rising income to compete in an arms race." *Id*. (emphasis supplied)

128.    The Washington Post found athletics departments engaging in discretionary, profligate spending on professional-grade facilities and amenities and on professional-level staffing and coaching salaries.

129.    For example, from Hobson and Rich, "The latest extravagances in the college sports arms race? Laser tag and mini golf":

> The people in charge of Clemson University's athletic department have not settled on a design for the miniature golf course they are building for their football team, but they know it will have just nine holes, not 18.
>
> That will leave room for the sand volleyball courts, laser tag, movie theater, bowling lanes, barber shop and other amenities planned in the $55 million complex that South Carolina's second-largest public university is building exclusively for its football players ….
>
> *****
>
> Facilities spending is one of the biggest reasons otherwise profitable or self-sufficient athletic departments run deficits ….
>
> A decade of rampant athletics construction across the country has redefined what it takes to field a competitive top-tier college sports program. Football stadiums and basketball arenas now must be complemented by practice facilities, professional-quality locker rooms, players' lounges with high-definition televisions and video game systems, and luxury suites to coax more money from boosters.

-35-

***** 

On April 19, 2013, the University of Tennessee dedicated its new $45 million Anderson Training Center, a 145,000-square-foot home for its football team with a two-story weight room, hydrotherapy room, amphitheater-style team meeting room and a public entrance featuring a waterwall and museum commemorating Volunteers football history.

At the dedication ceremony, Tennessee Athletic Director Dave Hart told donors that professional football scouts had offered unanimous praise.

"They have all told me this is the best facility, college or professional, that they've ever seen," Hart said. "Quite a tribute and quite a legacy to all of you who helped make this possible."

*****

The facilities arms race is not solely benefiting football teams. In the past decade, many athletic departments in the wealthy Power Five conferences – the Atlantic Coast Conference, Southeastern Conference, Big 12, Big Ten and Pacific-12 – have built baseball stadiums, volleyball courts, soccer fields, golf practice facilities and ice hockey arenas ….

*****

Some collegiate players now enjoy facilities superior to those offered by some professional teams. Florida State and the University of Florida have indoor football practice facilities. The NFL's Jacksonville Jaguars do not.

Asked about this, [Joel Leider, Vice President of SportsPLAN, specializing in design of collegiate athletic facilities] noted a significant difference between professional and college sports.

"When you can pay a player, that changes the equation," Leider said. "Just look at [Arizona Diamondbacks pitcher] Zack Greinke: He just signed for $200 million. I'll bet the quality of the locker room isn't that big a deal for him."

130.    Further, from Hobson and Rich, "Playing in the Red":

Auburn Athletics Chief Operating Officer David Benedict explained in an interview how his department lost more money in 2014 than it did in 2004, even though its income nearly doubled during that time ….

-36-

In 2004, Auburn athletics nearly broke even on earnings of $57.5 million. (All 2004 figures are adjusted for inflation.)

By 2014, income had risen to $109.3 million, but spending soared to $126.5 million ….

Coaches' pay more than doubled (from $9.3 million to $20.4 million). Facilities spending tripled (from $8.6 million to $27.8 million), thanks to a building boom including a new basketball arena and practice facility ($89.4 million), a new indoor football practice facility ($23.1 million) and a new soccer-track facility ($17.7 million).

Some purchases, Benedict acknowledged, were optional, like two new twin-engine jets: a six-seat 2008 Cessna Citation CJ2+ ($6.4 million) and a seven-seat 2009 Cessna Citation CJ3 ($7.8 million), each bearing a blue and orange "AU" insignia on its tail.

The jets are used primarily by coaches to criss-cross the country meeting with recruits, contributing to Auburn's recruiting costs nearly doubling in a decade, from $1.6 million to $2.7 million ….

That new [$13.9 million] video board, the largest in college sports, was also optional. Auburn has a history of trend-setting electronics displays. In 2007, it installed the first high-definition video board in the SEC, a $2.9 million purchase Athletic Director Jacobs decided was obsolete eight years later.

*****

It's not accurate, Benedict said, to analyze college athletics in terms of profits or losses.

"There's no for-profit company that would operate the way college athletics do," he said. "We don't make decisions based on the bottom line. If we did, things would operate very differently."

131.    The Washington Post noted, "[c]olleges generally treat athletic departments as stand-alone organizations, free to spend every dollar they earn," and "rarely prevent athletic directors from outspending their earnings." *Id.*

-37-

132.     The Washington Post cited David Ridpath, a business professor at

Ohio University:

> "College sports is big business, and it's a very poorly run big
> business. It's frustrating to see universities, especially public
> ones, pleading poverty . . . with a little bit of fiscal sense,
> [athletics programs] could turn profits or at least break even."

*Id*.

133.     The Washington Post noted that "there are athletic departments that profit

without a perennially great football team," *e.g.*, Indiana University:

> How do they do it?
>
> "Hoosier tightwadness," Indiana Athletics Director Fred Glass
> said. "We don't spend more than we take in."
>
> Glass expressed puzzlement when asked why so many
> departments struggle to turn a profit.

*Id*.

134.     The Washington Post quoted from the memoir of Walter Byers, the first

executive director of the NCAA ("Unsportsmanlike Conduct:  Exploiting College Athletes"):

> "Do any major sports programs make money for their universities?
> Sure, but the trick is to overspend and feed the myth that even
> the industry's plutocrats teeter on insolvency," Byers wrote.
> "At the heart of the problem is an addiction to lavish spending."

*Id*.

135.     Degree of profitability, impacted by financial difficulties, mismanagement or

misuse, **neither** determines **nor** discharges duties to properly classify and compensate

employees under the FLSA.

www.StudentAthleteEquity.com

**Scholarship Athletes Are Not Exempted from FLSA Coverage by Constitutional or Statutory Language**

***The Thirteenth Amendment's FLSA Exemption for
Unpaid Prison Labor Does Not Apply to Student Athletes***

136.    The U.S. Constitution exempts *one* class from FLSA coverage:  prisoners. Prisoners are excepted from the *Thirteenth Amendment*'s prohibition on slavery and involuntary servitude and may be compelled to perform unpaid (or underpaid) labor as punishment.  Thus, prisoners can prove no set of facts to establish employee status because the *Thirteenth Amendment* precludes such FLSA claims.  *See Thirteenth Amendment*;[5] *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992),[6] attached hereto as Ex. H; *also see Hale v. Arizona*, 993 F.2d 1387 (9th Cir. 1993) (citing *Vanskike*), attached hereto as Ex. I; *Tourscher v. McCullough*, 184 F.3d 236 (3d Cir. 1999) (citing *Vanskike*), attached hereto as Ex. J.

---

[5]    The *Thirteenth Amendment* reads, in pertinent part:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States ….

[6]    In *Vanskike*, the Circuit Court concluded:

> [T]he relationship between the DOC [Department of Corrections] and a prisoner is far different from a traditional employer-employee relationship, because … inmate labor belongs to the institution.  The *Thirteenth Amendment* excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work. Further, there is no Constitutional right to compensation for such work ....

> [L]iteral application of the *Bonnette* factors [*i.e.*, employee test criteria] in the present context …. fail to capture the true nature of the relationship for essentially they presuppose a free labor situation …. [T]he *Thirteenth Amendment's* specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment ….

> Prisoners are essentially taken out of the national economy upon incarceration .... Because Vanskike's allegations reveal that he worked in the prison and for the DOC pursuant to penological work assignments, the economic reality is that he was not an "employee" under the FLSA.

*Id.* at 809-10.

www.StudentAthleteEquity.com

137.    The *Thirteenth Amendment*'s FLSA exemption for unpaid (or underpaid) prison labor is controversial.  It has been criticized in the Oscar-nominated documentary "13th" , *see, e.g.*, Manohla Dargis, "Review: '13th,' The Journey from Shackles to Prison Bars," The New York Times, Sept. 29, 2016 and Bethonie Butler, "Ava DuVernay's Netflix film '13th' reveals how mass incarceration is an extension of slavery," The Washington Post, Oct. 6, 2016, and by both "conservative" and "liberal" commentators. *See, e.g.*, Randall John Meyer (of the Cato Institute), "Slavery Is Still Legal in the United States," Newsweek, Aug. 25, 2015 and Whitney Benns, "American Slavery, Reinvented," The Atlantic, Sept. 21, 2015.  In September 2016, the Incarcerated Workers' Organizing Committee coordinated a nationwide prison labor strike.  *See, e.g.*, E. Tammy Kim, "A National Strike Against 'Prison Slavery,'" The New Yorker, Oct. 3, 2016 and Max Blau and Emanuella Grinberg, "Why US inmates launched a nationwide strike," CNN, Oct. 31, 2016.

138.    Scholarship Athletes are **not** exempted from FLSA coverage as prisoners are, and, for reasons set forth in Paragraphs 140 through 145, *infra*, NCAA-*defined* amateurism does **not** preclude employee status under the FLSA as the *Thirteenth Amendment* does.

139.    The Washington Post was critical of reliance on the unpaid prison labor case *Vanskike v. Peters* (Ex. H) to preclude a broader claim of student athlete employee status, including "walk-ons," in *Berger v. NCAA*, 843 F.3d 285 (7th Cir. 2016).  *See* Sally Jenkins, "Are college athletes the same as prisoners?  These judges seem to think so," The Washington Post, Jan. 5, 2017, attached hereto as Ex. K.[7]

---

[7]    *Dawson v. NCAA*, No. 16-cv-05487, 2017 U.S. Dist. LEXIS 64082 (N.D. Cal. Apr. 25, 2017) similarly relied on the unpaid prison labor case *Hale v. Arizona*, which itself relies on *Vanskike*, *see* Ex. I, to preclude a claim of student athlete employee status against a NCAA member conference rather than against an NCAA member school.

***There Is Neither A "Student Athlete" Nor "Amateurism" Exemption in Statutory Language of the FLSA***

140.    **No** "student athlete" is among the enumerated employee exemptions in the FLSA, 29 U.S.C. § 213; **neither** "athlete" **nor** "athletic" appears in statutory language of the FLSA.

141.    **No** "amateurism" exemption to classification and compensation of employees is enumerated or defined in the FLSA; **neither** "amateur" **nor** "amateurism" appears in statutory language of the FLSA.

142.    NCAA-*defined* amateurism is **neither** sanctioned by, **nor** exempted from, the FLSA.[8]

143.    NCAA-*defined* amateurism rules not only lack the mandate or imprimatur of federal law, but also are entirely arbitrary and discretionary in prohibiting minimum wages for athletic performance required under Athletic Financial Aid Agreements *but* permitting, for example: (i) prize money under the U.S. Olympic Committee's Operation Gold Grant program, including $25,000 for each gold medal, $15,000 for each silver medal, and $10,000 for each bronze medal, NCAA Division I Bylaw 12.1.2.1.4.1.2 *(Adopted: 4/26/01 effective 8/1/01)*; (ii) up to $10,000 in prize money per calendar year for tennis recruits prior to full-time enrollment, NCAA Division I Bylaw 12.1.2.4.2.1 *(Adopted: 4/26/12, Revised: 1/19/13 effective 8/1/13)*; and (iii) minimum wages for work as counselors in college sports camps or clinics.  NCAA Division I Bylaws 12.4.3 and 13.12.

---

[8] For that matter, the FLSA **neither** sanctions, **nor** exempts, *any* arrangement or "tradition" defined by a putative employer *in lieu* of application of facts discovered to an employee test.  *See, e.g., Tony & Susan Alamo Found v. Sec'y of Labor*, 471 U.S. 290, 105 S. Ct. 1953, 85 L. Ed. 2d 278 (1985) (associates designated "volunteers" by a nonprofit religious foundation, who testified that they did not expect, or desire, to be paid by the foundation, nonetheless must be paid because the facts satisfied an employee test); *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016) (interns, who were unpaid by tradition, nonetheless must be compensated if the facts satisfy an employee test differentiating compensable work from academic or educational experiences).

144. In any event, student employment by colleges is **not** considered "professional." *See, e.g.*, Internal Revenue Code, 26 U.S.C. § 3121(b)(10) and 26 C.F.R. 31.3121(b)(10)-2.

145. Student employment by colleges is **not** subject to FICA (Social Security and Medicare) taxes. *Id.*

JOINT EMPLOYMENT OF SCHOLARSHIP ATHLETES

146. NCAA bylaws define the shared responsibilities and benefits of the joint enterprise of the NCAA and its member schools; are uniformly interpreted and applied by member schools to insure a "level playing field" under threat of competition and financial penalties issued by the NCAA for failure to comply; and restrict unilateral discretion of member schools to set terms and conditions of Scholarship Athlete labor, including: (i) recruitment (incoming freshmen and college transfers); (ii) eligibility for hire or to participate; (iii) hours of participation supervised by full-time coaching and training staff; (iv) compensation; (v) duration of employment or participation; and (vi) discipline. For these reasons, and those reasons set forth in Paragraphs 147 through 174, *infra*, NCAA member schools jointly employ members of the Scholarship Athlete Collective.[9]

### NCAA Restrictions on Unilateral Discretion in Recruiting

147. Separate and distinct employers do not, and arguably cannot, restrict each other's activities related to recruiting talent.

148. But, NCAA member schools, by mutual agreement, impose upon each other restrictions on permissible recruiting contacts and periods.

---

[9]   *See, e.g., North American Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980) (finding joint employment in a sports league where, "the League exercises a significant degree of control over essential aspects of the [member] clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline," and "each [member] club granted the [League] authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs.")

www.StudentAthleteEquity.com

149.   Contacts, defined as "any face-to-face encounter between a prospective student-athlete or the prospective student-athlete's parents, relatives or legal guardians …. regardless of whether any conversation occurs," are strictly limited.  NCAA Division I Bylaws 13.02.4 and 13.1.5.

150.   Evaluations, defined as "any off-campus activity designed to assess the academic qualifications or athletics ability of a prospective student-athlete," are also strictly limited.  NCAA Division I Bylaws 13.02.7 and 13.1.7.

151.   Even telephone calls to a prospective student athlete are strictly limited.  *See, e.g.*, NCAA Division I Bylaw 13.1.3.1.8 ("Once an institution reaches the applicable limit on telephone calls to a prospective student-athlete [] for a particular time period [], the institution may not initiate an additional telephone call during the same time period, even if no direct conversation occurs during the additional call (*e.g.*, voicemail message).")

152.   Contacts, Evaluations and telephone calls are further restricted by, or to, mutually agreed upon "Periods of Recruiting Activities":

> **Contact Period**.  A contact period is a period of time when it is permissible for authorized athletics department staff members to make in-person, off-campus recruiting contacts and evaluations.

> **Evaluation Period**. An evaluation period is a period of time when it is permissible for authorized athletics department staff members to be involved in off-campus activities designed to assess the academic qualifications and playing ability of prospective student-athletes. No in-person, off-campus recruiting contacts shall be made with the prospective student-athlete during an evaluation period.

> **Quiet Period**.  A quiet period is a period of time when it is permissible to make in-person recruiting contacts only on the institution's campus. No in-person, off-campus recruiting contacts or evaluations may be made during the quiet period.

www.StudentAthleteEquity.com

> **Dead Period**.  A dead period is a period of time when it is not
> permissible to make in-person recruiting contacts or
> evaluations on or off the institution's campus or to permit
> official or unofficial visits by prospective student-athletes to the
> institution's campus. It remains permissible, however, for an
> institutional staff member to write or telephone a prospective
> student-athlete during a dead period.

NCAA Division I Bylaw 13.02.5.

153.    There are no restrictions preventing a separate and distinct employer from

recruiting lateral talent from another and immediately deploying that talent, except,

perhaps, non-compete or non-disclosure agreements.

154.    But, NCAA member schools, by mutual agreement, impose upon each other

transfer rules restricting pursuit, and deployment, of lateral student athlete talent.

155.    For example, under NCAA Division I Bylaws 13.1.1.3 and 14.5.5:

> An athletics staff member or other representative of the
> institution's athletics interests shall not make contact with the
> student-athlete of another NCAA or NAIA four-year collegiate
> institution, directly or indirectly, without first obtaining the
> written permission of the first institution's athletics director (or
> an athletics administrator designated by the athletics director)
> to do so, regardless of who makes the initial contact.

156.    If, as described in Paragraphs 84 through 87, *supra*, a Scholarship Athlete

desires to transfer, he/she may be blocked from receiving an athletic scholarship to attend

his/her transfer college of choice.  *Id*.  ESPN observed:

> [W]ith athletes (and only athletes), the school the athlete is
> leaving has the power to limit to where an athlete can transfer
> and receive aid and participate in varsity athletics. That is the
> equivalent of a "noncompete" provision in an employment
> contract.

Jay Bilas, "Cameron Johnson is the perfect example of the transfer rule gone wrong,"

ESPN.com, June 13, 2017.

www.StudentAthleteEquity.com

157.   If a Scholarship Athlete does transfer, his/her new NCAA member school ordinarily cannot deploy his/her talent in NCAA contests for a full academic year. NCAA Division I Bylaw 14.5.5.1.

### NCAA Restrictions on Unilateral Discretion in Determining Eligibility for Hire or to Participate

158.   In separate and distinct employment, eligibility for hire is a matter of unilateral discretion, other than immigration status and, perhaps, license requirements.

159.   But, NCAA member schools, by mutual agreement, uniformly apply myriad NCAA bylaws by which the eligibility of any student athlete to be hired or engaged to participate in NCAA athletics is to be determined.  *See, e.g.*, NCAA Division I Bylaws Articles 10.  Ethical Conduct; 12.  Amateurism and Athletics Eligibility; and 14.  Academic Eligibility.

160.   NCAA member schools require each other to share information and report discrepancies that could impact the eligibility of any student athlete, including such material as it applies to prospective student athletes not yet enrolled at any institution, *see* NCAA Division I Bylaw 12.1.1.1.2.2 (regarding member school obligations to cooperate with the NCAA Eligibility Center), and to enrolled student athletes and prospective transfers. NCAA Division I Bylaw 12.7.2 (regarding an annual Student-Athlete Statement, including "information related to eligibility, recruitment, financial aid, amateur status, previous positive-drug tests … and involvement in organized gambling activities," to be administered to each student athlete at an institution and kept on file and made available for examination upon request by the NCAA.)

### NCAA Restrictions on Unilateral Discretion in Supervision

161.   In separate and distinct employment, there is unilateral discretion in supervision, subject to applicable statutes and, perhaps, collective bargaining.

162.     But, NCAA member schools, by mutual agreement, impose upon each other restrictions on Countable Athletically Related Activities ("CARA"), defined as "any required activity with an athletics purpose involving student-athletes and at the direction of, or supervised by, one or more of an institution's coaching staff."  NCAA Division I Bylaw 17.02.1.

163.     In playing and practice season, CARA is supposed to be limited to 4 hours per day and 20 hours per week; in off-season, CARA is supposed to be limited to a maximum of 8 hours per week with no more than 2 hours per week spent on skill-related workouts. NCAA Division I Bylaws 17.1.7.1 and 17.1.7.2.

164.     NCAA member schools require each other to record CARA hours daily on **timesheets** as in work study programs.  NCAA Division I Bylaw 17.1.7.3.4.

### NCAA Restrictions on Unilateral Discretion in Compensation

165.     In separate and distinct employment, there is unilateral discretion in compensation, subject to applicable statutes and, perhaps, collective bargaining.

166.     But, NCAA member schools, by mutual agreement, impose upon each other prohibitions on Scholarship Athlete compensation complained of in this action.  *See, e.g.,* NCAA Division I Bylaws 12.1.2 and 12.1.2.1.1. Compensation provided to a student athlete is considered a Severe Breach of Conduct (Level I Violation).  NCAA Division I Bylaw 19.1.1(f).

### NCAA Restrictions on Unilateral Discretion in Duration of Employment or Participation

167.     In separate and distinct employment, the duration of employment is a matter of unilateral discretion, subject to applicable statutes and, perhaps, collective bargaining.

-46-

168.     But, NCAA member schools, by mutual agreement, impose upon each other restrictions that, among other things: (i) require suspension of a student athlete from athletic participation for infraction of agreed upon NCAA bylaws, NCAA Division I Bylaw 12.11; (ii) set a Five-Year Rule expiration date for participation in NCAA athletics, NCAA Division I Bylaw 12.8; and (iii) set permissible grounds for early cancellation of athletic scholarships, which early cancellation effectively terminates a position on a team. NCAA Division I Bylaws 15.3.4 and 15.3.5.

### NCAA Restrictions on Unilateral Discretion in Discipline

169.     In separate and distinct employment, discipline is assessed through internal compliance or human resources processes, subject to applicable statutes and, perhaps, collective bargaining.  Competitors neither consult nor adjudicate.

170.     But, NCAA member schools, by mutual agreement, subject "home team" student athletes to the disciplinary processes of the NCAA Committee on Infractions and NCAA Infractions Appeals Committee, which committees include representatives from peer, competing institutions and prohibit participation, in adjudication, by anyone "directly connected with an institution under investigation." *See, e.g.*, NCAA Division I Bylaws 19.3.1, 19.3.4, 19.4.1 and 19.4.3.

### Enforcement of NCAA Restrictions on Unilateral Discretion in Terms and Conditions of Scholarship Athlete Labor

171.     Importantly, **no** NCAA member school has unilateral discretion to "opt out" of NCAA bylaws.

172.     Instead, in order to obtain an exemption from, or waiver of, any NCAA bylaw governing the terms and conditions of Scholarship Athlete labor, a NCAA member school must apply to a committee including representatives from peer, competing institutions.

www.StudentAthleteEquity.com

*See, e.g.*, the NCAA Initial-Eligibility Waivers Committee, NCAA Division I Bylaw 21.7.5.1, and NCAA Committee on Student-Athlete Reinstatement, NCAA Division I Bylaw 21.7.6.6.

173.    Infractions of any NCAA bylaw could subject a NCAA member school to substantial competition and financial penalties, including, but not limited to, suspension or termination of student athlete eligibility; reduction of scholarships for coming academic years; suspension of coaching staff; and/or disqualification from regular season competition and/or post-season and championship segments. *See, e.g.*, NCAA Division I Bylaws 19.9.5, 19.9.7 and 19.9.8.

174.    Furthermore, the NCAA Infractions Program establishes, under "Expectations and Shared Responsibility," that each NCAA member school "has an affirmative obligation to report all instances of noncompliance," and "cooperate fully with and assist," investigations, regarding any student athlete, including prospective student athletes not yet enrolled at any institution, or student athletes enrolled in another institution. *See, e.g.*, NCAA Division I Bylaws 19.2.2 and 19.2.3.  Failure to cooperate in an NCAA investigation is considered a Severe Breach of Conduct (Level I Violation).  NCAA Division I Bylaw 19.1.1(c).

**PLAINTIFF LAWRENCE "POPPY" LIVERS**

175.    Livers incorporates by reference the allegations contained in Paragraphs 1 through 174, *supra*, as though fully set forth.

176.    During academic year 2014-15, Livers performed unpaid labor for defendants as a Scholarship Athlete on the Villanova University Football roster.

177.    During the playing and practice season, Livers worked as a Scholarship Athlete at least 20 hours per week supervised by NCAA athletics supervisory staff.

www.StudentAthleteEquity.com

178.     Livers' work as a Scholarship Athlete was non-academic in nature and unrelated/irrelevant to an academic degree program.  He received no academic credit for work as a Scholarship Athlete.

179.     Livers' unpaid labor as a Scholarship Athlete primarily benefitted the defendants, and provided no *comparable* academic or learning benefit to him.

## CAUSE OF ACTION

### FAIR LABOR STANDARDS ACT | MINIMUM WAGE PROVISION

180.     Livers incorporates by reference the allegations contained in Paragraphs 1 through 179, *supra*, as though fully set forth.

181.     The minimum wage provisions in the FLSA, 29 U.S.C. §§ 201 *et seq.*, apply to defendants and protect Livers and members of the Scholarship Athlete Collective.

182.     Defendants have been, and continue to be, enterprises engaged in commerce within the meaning of 29 U.S.C. §§ 203(r) and (s), and to which minimum wage provisions of 29 U.S.C. § 206(a) apply.

183.     Livers and members of the Scholarship Athlete Collective have been, and/or continue to be, employees of defendants within the meaning of 29 U.S.C. § 203(e).

184.     Defendants have jointly employed, and/or continue to jointly employ, Livers and members of the Scholarship Athlete Collective within the meaning of 29 U.S.C. § 203(g).

185.     By operation of NCAA bylaws, defendants have jointly agreed to engage in a widespread pattern, policy, and practice of misclassifying Livers and members of the Scholarship Athlete Collective as unpaid labor rather than employees, prohibiting payment of minimum wages to them for any, and all, hours defendants suffered or permitted Livers and members of the Scholarship Athlete Collective to work.

www.StudentAthleteEquity.com

186.    Defendants were aware, or should have been aware, that their conduct described herein was unlawful.  Defendants' unlawful conduct has been willful, and they have made no good faith effort to comply with the FLSA with respect to proper classification and compensation of Livers and members of the Scholarship Athlete Collective.

187.    Livers and members of the Scholarship Athlete Collective have suffered damages, and are entitled to recovery of such damages, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

WHEREFORE, Livers, on his own behalf and on behalf of all others similarly situated, seeks the following relief:

A.    That, at the earliest possible time, defendant NCAA member schools be ordered to send notice of this action,[10] to members of the Scholarship Athlete Collective set forth, informing them that this action has been filed, of the nature of this action, and of their right to join this action;

B.    Unpaid wages, and an additional equal amount as liquidated damages pursuant to the FLSA and supporting federal regulations and guidance;

C.    Pre-judgment interest and post-judgment interest;

D.    Reasonable attorneys' fees and costs of the action;

---

[10]    Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose certain "directory information" to third parties, including information necessary to send notice to members of the Scholarship Athlete Collective such as names; permanent home addresses and/ or temporary local or campus addresses; and email addresses. To insure FERPA compliance and efficient case management, Livers requests that the Court order defendant NCAA member schools to send notice.

www.StudentAthleteEquity.com

E.     A declaration that NCAA bylaws, as uniformly interpreted and applied by the defendants to prohibit proper classification of Scholarship Athletes as employees and their compensation on a minimum wage scale, violate wage and hour provisions of the FLSA; and

F.     Such other relief as the Court shall deem just and proper.

Respectfully submitted,

s/  Paul L. McDonald

Paul L. McDonald
P L MCDONALD LAW LLC
1800 JFK Boulevard, Suite 300
Philadelphia, PA 19103
Telephone:  (267) 238-3835
Facsimile:  (267) 238-3801
Email:        paul@plmcdonaldlaw.com

*Counsel for Plaintiff and the
Proposed Collective*

Dated: September 25, 2017

www.StudentAthleteEquity.com

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all triable claims and issues.

Respectfully submitted,

s/   Paul L. McDonald

Paul L. McDonald
P L MCDONALD LAW LLC
1800 JFK Boulevard, Suite 300
Philadelphia, PA 19103
Telephone:  (267) 238-3835
Facsimile:   (267) 238-3801
Email:        paul@plmcdonaldlaw.com

*Counsel for Plaintiff and the*
*Proposed Collective*

Dated: September 25, 2017