Paul L. McDonald
P L MCDONALD LAW LLC
1800 JFK Boulevard, Suite 300
Philadelphia, PA 19103
Telephone:   (267) 238-3835
Facsimile:   (267) 238-3801
Email:         paul@plmcdonaldlaw.com

*Counsel for Plaintiff and
the Proposed Collective*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LAWRENCE "POPPY" LIVERS,<br><br>                            Plaintiff,<br><br>     v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a/k/a the NCAA, et al.<br><br>                            Defendants. | Civil Action No. 2:17-cv-04271-MMB |

**MOTION TO CONDITIONALLY CERTIFY FAIR LABOR STANDARDS ACT
COLLECTIVE ACTION AND SEND NOTICE**

This litigation concerns NCAA bylaws, adopted through a legislative process by NCAA member schools, which: (i) define the shared responsibilities and benefits of the joint enterprise of the NCAA and its member schools; (ii) are uniformly interpreted and applied by member schools to insure a "level playing field" under threat of competition and financial penalties issued by the NCAA for failure to comply; and (iii) compel the unlawful conduct complained of, *i.e.*, defendants' joint refusal and failure to properly classify the members of the Scholarship Athlete Collective[1] as employees and compensate them on a minimum wage scale in violation of the Fair Labor Standards Act ("FLSA").

---

[1] The Scholarship Athlete Collective includes recipients of athletic scholarships requiring them to participate in NCAA athletics at private and semi-public NCAA Division I member schools.

-1-

The purpose of this motion is to allow members of the Scholarship Athlete Collective to preserve their claims arising from defendants' misconduct.  To that end, Plaintiff respectfully requests that the Court allow this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b) and notice to be sent, as outlined below, in order to inform collective members of their rights as implicated in this litigation.

### A.    THE LENIENT STANDARD GOVERNING CONDITIONAL CERTIFICATION OF FLSA COLLECTIVE ACTION

A FLSA collective action, which requires claimants to opt-in, differs significantly from a Rule 23 class action, which includes claimants unless they opt-out.

Rule 23 class action certification standards do not apply to a FLSA collective action. No showing of numerosity, commonality, typicality, adequacy of representation and predominance is required in a FLSA collective action.  *See, e.g., Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 300 (E.D. Pa. Aug. 25, 2010) ("the FLSA's 'similarly situated' standard for certification of opt-in collective actions is distinct from the requirements set forth in Fed. R. Civ. P. 23 for opt-out classes"); *also Diabete v. MV Transp., Inc.*, No. 14-857, 2015 U.S. Dist. LEXIS 93762 (E.D. Pa. July 20, 2015) (granting conditional certification of a FLSA collective action, but denying class certification of Pennsylvania Minimum Wage Act and Wage Payment and Collection Law claims for failure to satisfy the commonality and predominance requirements of Rule 23).

Instead, in a FLSA collective action, the Court need only determine whether members of the proposed collective are "similarly situated," meaning they "share common 'terms and conditions' of employment, which may be shown through the existence of a 'common policy, plan, or practice.'" *Id.* at *15-16.

The Court applies a two-step process for deciding whether to proceed as a collective action under the FLSA.  *Id.*

In the first step, *before discovery*, the Court "must make a 'preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated," *i.e.*, determine whether to conditionally certify "'for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery.'" *Id.* Under this standard:

> [A] plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees. The level of proof required at this stage is fairly lenient: a "'modest factual showing' that the proposed recipients of opt-in notices are similarly situated" is all that is required.

*Id.* (citations omitted)

This "modest factual showing" can be made "in the form of affidavits, declarations, deposition testimony, or other documents." *Viscomi v. Clubhouse Diner*, No. 13-4720, 2016 U.S. Dist. LEXIS 43375 at *8-9 (E.D. Pa. Mar. 31, 2016).

When ruling on a motion for conditional certification:

> [t]he Court does not evaluate the merits of the case …. The sole question is whether plaintiff provides "modest" evidence that the proposed class "consists of similarly situated employees who were collectively 'the victims of a single decision, policy, or plan.'"

*Id.* (citations omitted)

In the second step, *after discovery*, defendants may move to cull or decertify a collective.

### B.   NCAA BYLAWS ENUMERATED IN THE NCAA DIVISION I MANUAL ARE THE "COMMON POLICY, PLAN, OR PRACTICE" SETTING TERMS AND CONDITIONS OF SCHOLARSHIP ATHLETES' COLLECTIVE UNPAID LABOR

The Complaint incorporates defendant business records: (i) the NCAA sample form Athletic Financial Aid Agreement on NCAA.org at

https://www.ncaa.org/sites/default/files/FinAidForm_0.pdf,[2] attached hereto as Ex. A; and (ii) the NCAA Division I Manual,[3] setting forth NCAA bylaws.

        1.        **The Athletic Financial Aid Agreement, *i.e.*, Scholarship Agreement**

All members of the Scholarship Athlete Collective are subjected to the same policies and practices obliging, and governing, their participation in NCAA athletics as recipients of athletic scholarships under Athletic Financial Aid Agreements that reference, and are subject to, NCAA Division I Bylaws Article 15. Financial Aid. *See* Ex. A; *also see, e.g.,* Compl. ¶¶ 28-31, and 45.

        2.        **Terms and Conditions of Unpaid Labor**

By operation and enforcement of bylaws set forth in the NCAA Division I Manual, all members of the Scholarship Athlete Collective are subjected to the same policies and practices prohibiting their proper classification as employees and compensation on a minimum wage scale and restricting NCAA member schools' unilateral discretion to set other terms and conditions of their unpaid labor, including, for example: (i) recruitment (incoming freshmen and college transfers); (ii) eligibility for hire or to participate; (iii) hours of supervision by full-time coaching and training staff; (iv) duration of employment or participation; and (v) discipline. *See, e.g.,* Compl. ¶¶ 146-174 (Joint Employment).

        a.        **Compensation**

NCAA member schools, by mutual agreement to NCAA bylaws, impose upon each other prohibitions on Scholarship Athlete compensation complained of in this litigation.

---

[2] All hyperlinks incorporated by reference, and in blue underlined font, were last visited on September 22, 2017.

[3] All references to the NCAA Division I Manual, and the bylaws contained therein, are to the *2017-18 Division I – August* edition, which is substantially similar to prior editions applicable to members of the Scholarship Athlete Collective at all relevant times.

-4-

*See, e.g.,* NCAA Division I Bylaws 12.1.2 and 12.1.2.1.1. Compensation provided to a student athlete is considered a Severe Breach of Conduct (Level I Violation). NCAA Division I Bylaw 19.1.1(f).

### b. Recruitment

NCAA member schools, by mutual agreement to NCAA bylaws, impose upon each other restrictions on permissible recruiting contacts and periods.

Contacts, defined as "any face-to-face encounter between a prospective student-athlete or the prospective student-athlete's parents, relatives or legal guardians …. regardless of whether any conversation occurs," are strictly limited. NCAA Division I Bylaws 13.02.4 and 13.1.5. Evaluations, defined as "any off-campus activity designed to assess the academic qualifications or athletics ability of a prospective student-athlete," are also strictly limited. NCAA Division I Bylaws 13.02.7 and 13.1.7. Even telephone calls to a prospective student athlete are strictly limited. *See, e.g.*, NCAA Division I Bylaw 13.1.3.1.8 ("Once an institution reaches the applicable limit on telephone calls to a prospective student-athlete [] for a particular time period [], the institution may not initiate an additional telephone call during the same time period, even if no direct conversation occurs during the additional call (*e.g.*, voicemail message).")

Contacts, Evaluations and telephone calls are further restricted by, or to, mutually agreed upon "Periods of Recruiting Activities":

> **Contact Period**. A contact period is a period of time when it is permissible for authorized athletics department staff members to make in-person, off-campus recruiting contacts and evaluations.
>
> **Evaluation Period**. An evaluation period is a period of time when it is permissible for authorized athletics department staff members to be involved in off-campus activities designed to assess the academic qualifications and playing ability of prospective student-athletes. No in-person, off-campus recruiting contacts shall be made with the prospective student-athlete during an evaluation period.

>**Quiet Period**.  A quiet period is a period of time when it is permissible to make in-person recruiting contacts only on the institution's campus. No in-person, off-campus recruiting contacts or evaluations may be made during the quiet period.
>
>**Dead Period**.  A dead period is a period of time when it is not permissible to make in-person recruiting contacts or evaluations on or off the institution's campus or to permit official or unofficial visits by prospective student-athletes to the institution's campus. It remains permissible, however, for an institutional staff member to write or telephone a prospective student-athlete during a dead period.

NCAA Division I Bylaw 13.02.5.

NCAA member schools, by mutual agreement to NCAA bylaws, also impose upon each other transfer rules restricting the pursuit, and deployment, of "lateral" student athlete talent.

For example, under NCAA Division I Bylaws 13.1.1.3 and 14.5.5:

>An athletics staff member or other representative of the institution's athletics interests shall not make contact with the student-athlete of another NCAA or NAIA four-year collegiate institution, directly or indirectly, without first obtaining the written permission of the first institution's athletics director (or an athletics administrator designated by the athletics director) to do so, regardless of who makes the initial contact.

If a Scholarship Athlete desires to transfer, he/she may be blocked from receiving an athletic scholarship at his/her transfer college of choice.  ESPN observed:

>[W]ith athletes (and only athletes), the school the athlete is leaving has the power to limit to where an athlete can transfer and receive aid and participate in varsity athletics. That is the equivalent of a "noncompete" provision in an employment contract.

[Jay Bilas, "Cameron Johnson is the perfect example of the transfer rule gone wrong," ESPN.com, June 13, 2017](#).

If a student athlete transfers, his/her new NCAA member school ordinarily cannot deploy his/her talent in NCAA athletic contests for a full academic year. NCAA Division I Bylaw 14.5.5.1.

### c.     Eligibility for Hire or to Participate

NCAA member schools, by mutual agreement, uniformly apply NCAA bylaws by which the eligibility of any student athlete to be hired or engaged to participate in NCAA athletics is to be determined.  *See, e.g.*, NCAA Division I Bylaws Articles 10.  Ethical Conduct; 12.  Amateurism and Athletics Eligibility; and 14.  Academic Eligibility.

For example, NCAA member schools require each other to share information and report discrepancies that could impact the eligibility of any student athlete, including such material as it applies to prospective student athletes not yet enrolled at any institution, *see* NCAA Division I Bylaw 12.1.1.1.2.2 (regarding member school obligations to cooperate with the NCAA Eligibility Center), and to enrolled student athletes and prospective transfers. NCAA Division I Bylaw 12.7.2 (regarding an annual Student-Athlete Statement, including "information related to eligibility, recruitment, financial aid, amateur status, previous positive-drug tests … and involvement in organized gambling activities," to be administered to each student athlete at an institution and kept on file and made available for examination upon request by the NCAA.)

### d.     Hours of Supervision

NCAA member schools, by mutual agreement to NCAA bylaws, impose upon each other restrictions on Countable Athletically Related Activities ("CARA"), defined as "any required activity with an athletics purpose involving student-athletes and at the direction of, or supervised by, one or more of an institution's coaching staff."  NCAA Division I Bylaw 17.02.1.  In playing and practice season, CARA is supposed to be limited to 4 hours per day and 20 hours per week; in off-season, CARA is supposed to be limited to a maximum of 8 hours per week with no more than 2 hours per week spent on skill-related workouts. NCAA Division I Bylaws 17.1.7.1 and 17.1.7.2.

NCAA member schools require each other to record CARA hours daily on timesheets as in work study programs. NCAA Division I Bylaw 17.1.7.3.4.

### e. Duration of Employment or Participation

NCAA member schools, by mutual agreement to NCAA bylaws, impose upon each other restrictions that: (i) require suspension of a student athlete for infraction of agreed upon NCAA bylaws, NCAA Division I Bylaw 12.11; (ii) set a Five-Year Rule expiration date for participation in NCAA athletics, NCAA Division I Bylaw 12.8; and (iii) set permissible grounds for cancellation of athletic scholarships, which effectively terminates a position on a team. NCAA Division I Bylaws 15.3.4 and 15.3.5.

### f. Discipline

NCAA member schools, by mutual agreement to NCAA bylaws, subject "home team" student athletes to the disciplinary processes of the NCAA Committee on Infractions and NCAA Infractions Appeals Committee, which committees include representatives from peer, competing institutions and prohibit participation, in adjudication, by anyone "directly connected with an institution under investigation." *See, e.g.*, NCAA Division I Bylaws 19.3.1, 19.3.4, 19.4.1 and 19.4.3.

### 3. Enforcement and Uniform Application of NCAA Bylaws

Importantly, **no** NCAA member school has unilateral discretion to "opt out" of NCAA bylaws.

Instead, in order to obtain an exemption from, or waiver of, any NCAA bylaw governing the terms and conditions of Scholarship Athlete labor, a NCAA member school must apply to a committee including representatives from peer, competing institutions. *See, e.g.*, the Initial-Eligibility Waivers Committee, NCAA Division I Bylaw 21.7.5.1, and Committee on Student-Athlete Reinstatement, NCAA Division I Bylaw 21.7.6.6.

Infractions of any NCAA bylaw could subject a NCAA member school to substantial competition and financial penalties, including, but not limited to, suspension or termination of student athlete eligibility; reduction of scholarships for coming academic years; suspension of coaching staff; and/or disqualification from regular season competition and/or post-season and championship segments. *See, e.g.*, NCAA Division I Bylaws 19.9.5, 19.9.7 and 19.9.8.

Further, the NCAA Infractions Program establishes, under "Expectations and Shared Responsibility," that each NCAA member school "has an affirmative obligation to report all instances of noncompliance," and "to cooperate fully with and assist," investigations, regarding any student athlete, including prospective student athletes not yet enrolled at any institution, or student athletes enrolled in another institution.  *See, e.g.*, NCAA Division I Bylaws 19.2.2 and 19.2.3.  Failure to cooperate in an NCAA investigation is considered a Severe Breach of Conduct (Level I Violation). NCAA Division I Bylaw 19.1.1(c).

### C. THIS CASE MORE THAN MEETS THE LENIENT STANDARD FOR CONDITIONAL CERTIFICATION OF FLSA COLLECTIVE ACTION

At this first step, *before discovery*, Plaintiff has more than met the lenient standard for conditional certification.  It is indisputable that Plaintiff, and **all** members of the Scholarship Athlete Collective, are victims of common policy, plan and practice, affecting the terms and conditions of Scholarship Athletes' collective unpaid labor, by operation and enforcement of NCAA bylaws set forth in the NCAA Division I Manual and referenced in the NCAA sample form Athletic Financial Aid Agreement.

### D. DEFENDANT NCAA MEMBER SCHOOLS SHOULD SEND NOTICE TO INSURE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT COMPLIANCE

Pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), a/k/a the Buckley Amendment, a student may require a school to not disclose

certain "directory information" to third parties, including information necessary to send notice to members of the Scholarship Athlete Collective such as names; permanent home addresses and/ or temporary local or campus addresses; and email addresses.

To insure FERPA compliance and efficient case management, Plaintiff requests that the Court order the defendant NCAA member schools to send notice.

Because defendant NCAA member schools are not in continuous, full academic session at all times, *e.g.*, seasonal breaks, and do not require student attendance, engagement or communication during breaks, they differ from year-round or full-time employers.

Here, the collective differs from most, too, as it is composed entirely of temporary employees, and students or recent graduates – several in the midst of life transitional phases not conducive to establishing, and maintaining, reliably permanent residence.

Moreover, the potential collective is sizable, and will increase with each incoming freshman class during the pendency of this case.

According to NCAA *Division I Revenues and Expenses (2004-2015)*, in Fiscal Year 2015, the average numbers of student athletes per school were as follows:

> **Football Bowl Subdivision ("FBS")**
> **Average Number of Student Athletes, FY2015**
> 609
>
> **Football Championship Subdivision ("FCS")**
> **Average Number of Student Athletes, FY2015**
> 524
>
> **Not Competing in Football**
> **Average Number of Student Athletes, FY2015**
> 377

These averages do not disaggregate student athletes on athletic scholarship from those not, *i.e.*, "walk-ons," but, upon information and belief, the vast majority of student athletes are recipients of partial, if not full, athletic scholarships at some time during matriculation.

If, for the sake of simple mathematics, these averages are divided by four assuming even distribution among academic classes (*i.e.*, freshmen, sophomores, juniors and seniors), then the average numbers of claimants per school, for a three-year statute of limitations extending from the current academic year, are approximately as follows:[4]

>   **FBS**
>   **Average Number of Claimants, through Academic Year 2016-17**
>   913
>
>   **FCS**
>   **Average Number of Claimants, through Academic Year 2016-17**
>   786
>
>   **Not Competing in Football**
>   **Average Number of Claimants, through Academic Year 2016-17**
>   565

Using the same assumption of even distribution among academic classes, the number of claimants per school approximately increases each academic year of pendency as follows:

>   **FBS**
>   **Average *Increase* in Claimants per Academic Year of Pendency**
>   152
>
>   **FCS**
>   **Average *Increase* in Claimants per Academic Year of Pendency**
>   131
>
>   **Not Competing in Football**
>   **Average *Increase* in Claimants per Academic Year of Pendency**
>   94

This case has been filed as a Defendant Class Action, naming 20 private and semi-public NCAA member schools identified in Ex. B, attached hereto, as class representatives of a larger class including another 97 private and semi-public NCAA member schools identified in Ex. C, attached hereto.

---

[4] This even distribution among academic classes is then multiplied by six to include the three classes of current scholarship athletes, who have performed for at least one academic year (*i.e.*, sophomores, juniors and seniors) and the three most recent classes of alumni scholarship athletes.

Notice could be limited to the 20 named, defendant class representative member schools until such time as other member schools are joined; under such case management, Plaintiff requests that the Court enter an order tolling the statute of limitations as to the remaining 97 member schools in the defendant class so that the rights of all members of the Scholarship Athlete Collective are similarly preserved.

In any event, whether the multiplier is 20 member schools or 117 member schools, the potential collective is large.

Under these facts, and in order to permit the greatest number of collective members to get notice, Plaintiff requests that the Court order defendant NCAA member schools to to send, and publish, notice no later than February 1, 2018 for an opt-in period of *at least* 120 days[5] to conclude no sooner than June 1, 2018, *via*: (i) first class mail (sent to local or campus address); (ii) email (sent both to campus email address and, if provided by the student, to identified third-party service provider email address); (iii) inclusion as an insert at the front of any Student Athlete Handbook, or as an addendum if such handbook has already been distributed (in either case, printed on yellow paper); and (iv) posting in athletic training, meeting, and break facilities in proximity to important announcements.

Plaintiff requests that the Court toll the statute of limitations during briefing and ruling on this motion; during preparations for sending and publishing of notice, and through the conclusion of the notice period.

For each academic year of pendency, Plaintiff requests that additional notice, including revised dates, be sent to incoming freshmen and transfer student athletes. In this event, Plaintiff will timely submit a proposed notice, in the form previously approved, with revised dates.

---

[5] *See, e.g., Mott v. Driveline Retail Merch., Inc.*, 23 F. Supp. 3d 483 (E.D. Pa. May 21, 2014) (granting 120 day opt-in period for potential collective of 27,095 merchandisers, who performed services related to the display of products and promotional materials in retail stores across several states).

If, at any time, other NCAA member schools are joined and/or the Court denies Plaintiff's request for an order tolling the statute of limitations as to any other member school in the defendant class, Plaintiff will timely submit a proposed notice to be sent by such other member school, in the form previously approved if applicable, with revised dates.

### E. PLAINTIFF'S PROPOSED NOTICE SHOULD BE APPROVED

A copy of the notice that Plaintiff proposes defendant NCAA member schools send, and publish, is attached to this motion as Ex. D. This notice informs collective members in neutral language of the nature of the action, of their right to participate in it by filing a consent to join form with the Court, and the consequences of their joining or not joining.

The Scholarship Athlete Collective is defined as:

> All current and former NCAA Division I student athletes who received partial or full athletic scholarships *at any time* while on NCAA men's and women's sports rosters for private and semi-public NCAA Division I member schools from academic year 2014-15 to the present.

## CONCLUSION

For all of the foregoing reasons, Plaintiff requests that the Court enter an Order conditionally certifying a FLSA collective, and ordering defendant NCAA member schools to send, and publish, notice as set forth herein.

    Respectfully submitted,

    s/   Paul L. McDonald

    Paul L. McDonald
    P L MCDONALD LAW LLC
    1800 JFK Boulevard, Suite 300
    Philadelphia, PA 19103
    Telephone:  (267) 238-3835
    Facsimile:   (267) 238-3801
    Email:        paul@plmcdonaldlaw.com

    *Counsel for Plaintiff and the Proposed Collective*

Dated: September 26, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2017, the foregoing document was served on counsel by filing via the CM/ECF system, which will send an email notice to registered parties.

In addition, this same date, courtesy copies were sent by email to prior counsel of record for defendants:

| | |
|---|---|
| Lisa A. Schreter | Paul DeCamp |
| Littler Mendelson P.C. | Epstein Becker & Green, P.C. |
| lschreter@littler.com | PDeCamp@ebglaw.com |

                                                s/   Paul L. McDonald

                                                Paul L. McDonald
                                                P L McDonald Law LLC

                                                *Counsel for Plaintiff and the*
                                                *Proposed Collective*