## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAWRENCE "POPPY" LIVERS, on his own behalf and on behalf of similarly situated persons <br>      v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a/k/a the NCAA, and the following NCAA Division I Member Schoolsi as representatives of a Defendant Class of all private and semi-public member schools that entered/enter into Athletic Financial Aid Agreements with the Plaintiff Collective: <br> BUCKNELL UNIVERSITY, <br> DREXEL UNIVERSITY, <br> DUQUESNE UNIVERSITY, <br> FAIRLEIGH DICKINSON UNIVERSITY, <br> LA SALLE UNIVERSITY, <br> LAFAYETTE COLLEGE, <br> LEHIGH UNIVERSITY, <br> MONMOUTH UNIVERSITY, <br> RIDER UNIVERSITY, <br> ROBERT MORRIS UNIVERSITY, <br> SETON HALL UNIVERSITY, <br> SAINT FRANCIS UNIVERSITY, <br> SAINT JOSEPH'S UNIVERSITY, <br> ST. PETER'S UNIVERSITY, <br> VILLANOVA UNIVERSITY <br> UNIVERSITY OF DELAWARE <br> PENNSYLVANIA STATE UNIVERSITY <br> UNIVERSITY OF PITTSBURGH <br> RUTGERS, STATE UNIVERSITY OF NEW JERSEY <br> TEMPLE UNIVERSITY | CIVIL ACTION <br><br> NO.  17-4271 |

Baylson, J.                                                                      May 17, 2018

### MEMORANDUM RE: MOTION TO DISMISS

Plaintiff "Poppy" Livers seeks damages under the Fair Labor Standards Act ("FLSA"),

arising out of his highly-publicized career as a football star while a student at Villanova

1

University.  Ultimately, do the facts allow a conclusion that he was an "employee?"  Looking at

literature, both old and new, and of course, opera, it can sometimes be easy but other times

difficult, to determine who exactly is, or is not, an employee.  Shakespeare shows respect for the

power of royalty over commoners, as seen in plays such as *King Lear* and *Othello*.  But, there

can be questions about employment status, as to the gravediggers in *Hamlet*, metaphors for

laborers, as to who employed them?  In Dickens' world, Scrooge was a mean boss and Bob

Cratchit was clearly his abused employee (who undoubtedly would have benefitted from FLSA

protections).  Turning to espionage, the identity of the employer is often ambiguous.  One

question frequently asked about characters in LeCarre novels is, "Who are you working for?" –

the elusive answer may not be solved until the final page and provides ongoing suspense.

Turning to opera, Mozart also respected the privileges of royalty, but with cynicism.  In *The

Marriage of Figaro*, there is no doubt that the Count is completely in charge; his employees have

few rights and may not have been paid any wages at all.  In *Cosi Fan Tutte*, on the other hand,

Mozart, as the musician of the Enlightenment, portrays the maid Despina as constantly

outsmarting her employers, Dorabella and Fiordiligi.  But, when we consider Wagner, questions

can arise.  Were Fasolt and Fafner, who contracted with Wotan to build Valhalla, employees or

independent contractors?  Or were they working for all of the "gods," on a "joint employment

basis."  Although truth is paramount, at the moment we deal only with allegations.  As Plaintiff

alleges in exceedingly, and sometimes excessively, detailed paragraphs (174), he requests this

Court to endorse a "joint employment theory," as to all of the Defendants.

Plaintiff Livers alleges that Defendant National Collegiate Athletic Association

("NCAA"), Villanova University, and dozens of other NCAA member schools, violated his right

to be paid as an employee of the Defendants, acting jointly, for his participation on the Villanova

football team as a Scholarship Athlete.  Plaintiff seeks to represent a putative class of individuals

termed the "Scholarship Athlete Collective," comprised of all recipients of athletic scholarships

under Athletic Financial Aid Agreements that require participation in NCAA athletics at NCAA

Division I member schools.  Plaintiff asserts a single claim under the Minimum Wage provisions

of the Fair Labor Standards Act ("FLSA") against all Defendants.

Presently before the Court are two separate Motions to Dismiss the Complaint for failure

to state a claim for which relief can be granted and for lack of standing.  One Motion was filed

by the NCAA and several member schools, including Villanova University.  The other Motion

was filed by the other NCAA member schools.  The Court does not know why Defendants filed

Motions to Dismiss separately.  For the reasons discussed below, Defendants' motions are

granted in full, with prejudice as to the schools that Plaintiff did not attend, without prejudice and

with leave to re-plead as to the NCAA and Villanova University.

## I.     Summary of Allegations

### A.     Background

Plaintiff Lawrence "Poppy" Livers is an adult who lives in Montgomery County,

Pennsylvania.  (ECF 1, Complaint ¶ 19.)  Plaintiff Livers was a Scholarship Athlete on the

Villanova University Football roster during the academic year 2014-15, engaging in at least

twenty hours per week during playing and practice season of activity supervised by NCAA

athletics supervisory staff.  (Id. ¶ 177.)  His work as a Scholarship Athlete was non-academic in

nature and unrelated and irrelevant to an academic degree program, and he received no academic

credit for it.  (Id. ¶ 178.)

The NCAA employs a legislative process to establish bylaws to govern member schools. (Id. ¶ 28.)  NCAA bylaws subject all Scholarship Athletes to uniform policies and practices which prohibit the classification of athletes as employees entitled to minimum wage compensation, and which include uniform policies regarding the recruitment of athletes, eligibility of athletes to participate, hours and duration of athletes' participation, and discipline. (Id. ¶ 29.)

**B.     Academic and Athletic Scholarships Are Not Compensation**

Academic and athletic scholarships are both grants-in-aid designed to assist academically eligible students in defraying costs of attendance.  (Id. ¶ 46.)  Academic and athletic scholarships, as compared with some other forms of scholarships, are not taxable income as applied to qualified education expenses required for enrollment and attendance.  (Id. ¶¶ 47-48.) An academic scholarship is not compensation to prepare for and/or participate in class, and an athletic scholarship is not compensation to prepare for and/or participate in NCAA athletics.  (Id. ¶¶ 49-50.)

**C.     Comparison of Scholarship Athletes with Academic Scholarship Recipients**

Both athletic and academic scholarships require recipients to maintain academic standards for scholarship eligibility.  (Id. ¶ 51.)  Athletic scholarships impose additional obligations and limitations on recipients as compared with academic scholarships.  (Id. ¶ 52.) Specifically, athletic scholarships obligate recipients to participate in NCAA athletics as directed and controlled by coaching and training staff, athletics department personnel, and NCAA compliance officers.  (Id. ¶ 53.)  This participation requirement interferes with, rather than facilitates, academic studies.  (Id. ¶ 54.)

NCAA Division I Constitution Article 2.14 states: "time required of student athletes for participation in intercollegiate athletics [must] be regulated to minimize interference with their opportunities for acquiring a quality education in a manner consistent with that afforded the general student body." (Id. ¶ 55.)  NCAA bylaws seek to achieve minimized interference in the following ways: (i) limiting class time missed; (ii) limiting hours of athletic activities supervised by coaching staff to twenty hours per week in playing and practice season and eight hours per week in off-season; and (iii) requiring NCAA athletics supervisory staff to record the hours of athletic participation on timesheets the same as work study supervisors are required to record the hours of student employment.  See, NCAA Division I Bylaws 17.1.7.1; 17.1.7.2; 17.1.7.3.4; 17.1.7.9.1; and 17.1.7.9.2.  (Compl. ¶ 56.)

The NCAA Growth, Opportunities, Aspirations and Learning of Students (GOALS) Study (2015) suggests that NCAA regulations that attempt to minimize interference by athletic participation with academic studies is ineffectual and/or for appearances.  (Compl. ¶ 57.) Between 25-36% of student athletes (depending upon the sport) reported that athletic participation prevented them from pursuing their preferred major; between 34-53% reported that participation prevented them from taking classes they wanted to take; and between 38-45% reported that they felt less than positive about their ability to keep up with classes in season. (Id.)

If injury or illness prevents a Scholarship Athlete from participating in NCAA athletics, the Athletic Financial Aid Agreement obligates the student to "assist the athletics department in other operational activities (i.e., coaching and/or support staff duties)" as directed and controlled by NCAA supervisory staff.  (Id. ¶ 63.)

Athletic scholarships are not guaranteed for the entirety of a Scholarship Athletes'

college attendance; rather athletic scholarships are "given initially for up to one year" and "can

be renewed, reduced, increased or canceled from year to year for almost any reason" by NCAA

athletics supervisory staff.

See, http://fs.ncaa.org/Docs/eligibility_center/Athletics_Information/FinancialAid.pdf; also

http://www.ncaa.org/student-athletes/future/scholarships. (Compl. ¶ 74.)

Several additional bases exist for cancelling or reducing an athletic scholarship, including

when the Scholarship Athlete "renders himself/herself ineligible for intercollegiate competition"

by breaking or being suspected of breaking an NCAA rule; engages in "manifest disobedience";

"fails to attend…meetings…and participate in athletic practice sessions and scheduled contests";

"does not comply with expected personal conduct, appearance and dress, both on and off the

University campus…when such violations bring discredit to the athletic program"; or "fails to

adhere to training rules and regulations." See NCAA Division I Bylaws 15.3.4.2 and 15.3.5.1.

(Compl. ¶ 77.)

By contrast, most academic scholarships are allotted by academic classifications, that is,

a recipient retains the scholarship through graduation as long as she/he continues to maintain

academic eligibility standards. (Compl. ¶ 75.) Academic and athletic scholarships both may be

cancelled early if the recipient becomes academically ineligible, engages in fraud or serious

misconduct, or withdraws from the program to which the scholarship applies. (Id. ¶ 76.)

Scholarship Athletes are subject to stricter discretionary control of conduct by college

supervisory staff than are academic scholarship recipients. (Id. ¶ 83.)

Scholarship Athletes who seek to transfer schools may be blocked from receiving an athletic scholarship at the school she/he wishes to transfer to.  <u>See</u>, NCAA Division I Bylaws 13.1.1.3 and 14.5.5.  (Compl. ¶ 84.)  If a Scholarship Athlete does transfer to a different school, she/he ordinarily cannot participate in NCAA athletics for a full academic year.  <u>See</u>, NCAA Division I Bylaw 14.5.5.1.  (Compl. ¶ 84.)

### D.  Comparison of Scholarship Athletes with Students in Work Study Programs

Scholarship Athletes are not paid for participation in NCAA athletics or for performing the operational activities that they are required to assist in when injured or ill.  (Compl. ¶ 64.) Academic scholarship recipients participating in work study programs, on the other hand, are paid on a minimum wage scale for operational activities on campus, including in the athletics department and at NCAA contests, for example working as ticket takers, seating attendants, and food concession workers.  (<u>Id.</u> ¶¶ 65-66.)  Due to Scholarship Athletes' time consuming obligatory participation in NCAA athletics they do not have any time available in their schedule to apply for and work in work study positions that would pay them minimum wage.  (<u>Id.</u> ¶ 67.) Some Scholarship Athletes may be forbidden to apply for work study positions by NCAA athletics supervisory staff, in order to ensure time to comply with NCAA progress-toward-degree requirements, found in NCAA Division I Bylaw 14.4, or by work study supervisors, in order to ensure compliance with work study guidelines that limit work based on "how the combination of work and study hours will affect the student's health and academic progress."  <u>See</u>, U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, 6-46.  (Compl. ¶ 68.) Scholarship Athletes are prohibited from gaining financially by earning money or accepting discounts by "trading" on their athletics reputation, and if they violate this prohibition will face suspension or termination of eligibility.  (<u>Id.</u> ¶ 69.)

Scholarship Athletes' participation in NCAA athletics is more arduous and time-consuming, and more detrimental to academic studies, than student employment in work study jobs. (Id. ¶ 89.) The 2015 NCAA GOALS study indicated that median student athlete reported hours per week of participation in athletic activities was more than 30 hours per week, and for some sports more than 40 hours per week, while the maximum commitment permitted of students employed in work study programs is twenty hours per week. (Id. ¶ 57.) Similar to students employed in work study programs, Scholarship Athletes' performance primarily benefits the NCAA member school, and provides no comparable academic or learning benefit to the student. (Id. ¶ 90.) Revenue generated by NCAA athletics, and benefits from NCAA athletics including promotion and exposure that can increase prospective student applications and help fundraising at member schools, far exceed any revenue generated by, or benefits related to, work study programs. (Id. ¶ 93.)

Scholarship Athletes are subject to stricter discretionary control of performance and conduct by college supervisory staff than students in work study. (Id. ¶ 94)

### E.     Comparison of Scholarship Athletes with Students Involved in Student-Run Groups

Student participants in student-run groups have a different experience than NCAA Scholarship Athletes and students who participate in work study programs because students are solely or principally responsible for student-run group leadership, organization and decision-making; faculty involvement, if it exists, is advisory, not supervisory, and is not a full-time duty. (Id. ¶ 96.) In addition, in contrast to NCAA athletics and work study programs, hours of participation in student-run groups are not recorded on timesheets maintained by supervising staff. (Id. ¶ 97.) Scholarship Athletes are subject to far stricter discretionary control of

performance and conduct by college supervisory staff than are members of student-run groups. (Id. ¶ 98.)  Student-run groups are often related/relevant to an academic degree program and/or eligible for academic credit, in contrast to NCAA athletics and work study programs.  (Id. ¶ 99.) NCAA member schools describe student-run group leadership, organization and decision-making that occurs in the context of intramural and interscholastic club sports as education experiences distinctly different from NCAA athletics.  (Id. ¶ 100.)

### F.    Revenue Generation and Employment Status

Several persons treated as college employees generate no, or *de minimis*, revenue, including students in work study programs, college support staff who perform operational activities on campus, and college staff in "cost centers," that is, departments that spend money without bringing money in.  (Id. ¶ 105.)

In NCAA athletics, and professional sports, athletes are revenue-generating because it is their athletic performance that is marketed and sold to consumers as a sports product.  (Id. ¶ 106.)  By contrast to athletes, coaches, training staff and team administrative personnel generate no, or considerably less, revenue from their performance.  (Id. ¶ 107.)  Consumers attend or tune into athletic contests primarily to see players play. (Id. ¶ 108.)

Athletes are also crucial to selling the sports product through promotion, including the use of their names, images, and likenesses in advertising, interaction with the community of sports consumers, interaction with the community of sports donors, and interaction with sports broadcasters and media.  (Id. ¶ 110.)  Only select members of the coaching and training staff and team administrative personnel are involved in selling the sports product through promotion.  (Id. ¶ 111.)  For these reasons, in the context of professional sports most athletes are paid more than coaches, training staff, and team administrative personnel.  (Id. ¶ 112.)  In Fiscal Year 2015, the

median total salaries and benefits for NCAA athletics supervisory staff for NCAA member schools competing in the Football Bowl Subdivision was over $25 Million; for member schools competing in the Football Championship Subdivision the median total was over $6 Million; and for member schools not competing in football the median total was over $4 Million.  (Id. ¶ 113.) Scholarship Athletes are not paid.  (Id. ¶ 114.)

### G.    Joint Employment Allegations: NCAA Member School Agreements

NCAA member schools, by agreement among them, impose on all member schools restrictions on the number of permissible recruiting contacts (face to face interactions with a prospect), evaluations (off-campus activity designed to assess the athletic ability or academic qualifications of a prospect), phone calls, and the permissible time periods during which all of this activity can occur in.  (Id. ¶¶ 148-52.)  NCAA member schools also, by agreement, impose restrictions on the recruitment of student-athletes who are already attending other member schools, and the circumstances under which a Scholarship Athlete may transfer between schools and retain eligibility for a scholarship and to compete.  (Id. ¶¶ 154-57.)

NCAA member schools, by agreement among them, uniformly impose NCAA bylaws which determine the eligibility of any student athlete to participate in NCAA athletics.  See, e.g., NCAA Division I Bylaws Articles 10. Ethical Conduct; 12. Amateurism and Athletics Eligibility; and 14. Academic Eligibility.  (Compl. ¶ 159.) NCAA member schools already require information sharing and reporting of information that could impact the eligibility of any prospective or current student athlete.  See, NCAA Division I Bylaw 12.1.1.1.2.2; NCAA Division I Bylaw 12.7.2.  (Compl. ¶ 160.)

NCAA member schools, by mutual agreement, impose restrictions on Countable Athletically Related Activities ("CARA") defined as "any required activity with an athletics purpose involving student-athletes and at the direction of, or supervised by, one or more of an institution's coaching staff." NCAA Division I Bylaw 17.02.1. (Compl. ¶ 162.) In playing and practices season CARA is limited to four hours per day and twenty hours per week; in off-season, CARA is limited to a maximum of eight hours per week with a maximum of two hours per week spent on skill-related workouts. NCAA Division I Bylaws 17.1.7.1 and 17.1.7.2. (Compl. ¶ 163.) NCAA member schools require each other to record CARA hours daily on timesheets as in work study programs. NCAA Division I Bylaw 17.1.7.3.4. (Compl. ¶ 164.)

NCAA member schools, by mutual agreement, impose prohibitions on Scholarship Athlete compensation. NCAA Division I Bylaws 12.1.2 and 12.1.2.1.1. (Compl. ¶ 166.) Compensation provided to a student athlete is considered a Severe Breach of Conduct (level I Violation). NCAA Division I Bylaw 19.1.1(f). (Compl. ¶ 166.) .

NCAA member schools, by mutual agreement, require suspension of a student athlete from athletic participation for infraction of the NCAA bylaws, NCAA Division I Bylaw 12.11, set a five-year expiration date for participation in NCAA athletics, NCAA Division I Bylaw 12.8, and specify permissible bases on which athletic scholarships can be canceled early, which effectively constitutes termination of an athlete's position on a team, NCAA Division I Bylaws 15.3.4 and 15.3.5. (Compl. ¶ 168.)

NCAA member schools, by mutual agreement, subject student athletes to discipline by the NCAA Committee on Infractions and NCAA Infractions Appeals Committee, which include representatives from peer institutions and prohibit participation in adjudication by anyone

connected with an institution under investigation. NCAA Division I Bylaws 19.3.1, 19.3.4, 19.4.1 and 19.4.3. (Compl. ¶ 170.)

No NCAA member school has unilateral discretion to "opt out" of NCAA bylaws. (Compl. ¶ 171.) In order to obtain an exemption from any NCAA bylaw governing Scholarship Athletes, a NCAA member school must apply to a committee including representatives from peer, competing institutions. The NCAA Initial-Eligibility Waivers Committee, NCAA Division I Bylaw 21.7.5.1, and NCAA Committee on Student-Athlete Reinstatement, NCAA Division I Bylaw 21.7.6.6. (Compl. ¶ 172.) Infractions of an NCAA bylaw could subject a member school to financial penalties, suspension or termination of student athlete eligibility, reduction of scholarships for coming academic years, suspension of coaching staff, and/or disqualification from competition. NCAA Division I Bylaws 19.9.5, 19.9.7 and 19.9.8. (Compl. ¶ 173.)

Furthermore, the NCAA Infractions Program establishes, under "Expectations and Shared Responsibility," that each NCAA member school "has an affirmative obligation to report all instances of noncompliance," and "cooperate fully with and assist," investigations, regarding any student athlete, including prospective student athletes not yet enrolled at any institution, or student athletes enrolled in another institution. See, NCAA Division I Bylaws 19.2.2 and 19.2.3. (Compl. ¶ 174.) Failure to cooperate in an NCAA investigation is considered a Severe Breach of Conduct (Level I Violation). NCAA Division I Bylaw 19.1.1(c). (Compl. ¶ 174.)

## II. Procedural History

On September 26, 2017 Plaintiff filed a Complaint. (ECF No. 1.) The Complaint states one claim on behalf of Plaintiff and the putative class:

1. Violation of 29 U.S.C. §§ 201 et seq., specifically, failing to compensate Plaintiff and members of the putative class pursuant to the minimum wage provisions set out in 29

U.S.C. § 206(a).

All Defendants moved to dismiss the Complaint on December 28, 2017.  Defendants Bucknell University, Drexel University, Lafayette College, and Lehigh University together filed a Motion to Dismiss (ECF No. 23).  Defendants NCAA, Duquesne University, Fairleigh Dickinson University, La Salle University, Monmouth University, the Pennsylvania State University, Rider University, Robert Morris University, Rutgers, The State University of New Jersey, Saint Francis University, Saint Joseph's University, St. Peter's University, Seton Hall University, Temple University, University of Delaware, University of Pittsburgh, and Villanova University, together filed a separate Motion to Dismiss (ECF No. 24).  Plaintiff responded to both Motions together (ECF No. 28).  Both groups of Defendants replied (Defendants Bucknell, et al., at ECF No. 35; Defendants NCAA, et al., at ECF No. 37).

The Court held oral argument on April 19, 2018 on the Motions to Dismiss.

### III.    Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential–Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted.  Id. at 678, 684.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555); see also

Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without

some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she

provide not only 'fair notice,' but also the 'grounds' on which the claim rests.") (citing

Twombly, 550 U.S. at 556 n.3). Accordingly, to survive a motion to dismiss, a plaintiff must

plead "factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

Only a facial challenge to standing, as opposed to a factual challenge, may be considered

at the motion to dismiss stage. In re Schering Plough Corp. Intron/Temodar Consumer Class

Action, 678 F.3d 235, 243 (3d Cir. 2012). When considering a facial challenge to standing, a

court applies much the same standard of review as it does to 12(b)(6) motions. See Baldwin v.

Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 73 (3d Cir. 2011). "With respect to 12(b)(1) motions

in particular, the plaintiff must assert facts that affirmatively and plausibly suggest that the

pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely

consistent with such a right." In re Schering Plough Corp., 678 F.3d at 243 (quoting Stalley v.

Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007)).

IV.    Discussion

A.    Parties' Contentions

i.    Statute of Limitations

Defendants assert that the Department of Labor's ("DOL") Field Operations Handbook

("FOH") creates a time bar to Plaintiff's Complaint. Def.s NCAA, et al., Mot at 14.[1] Unless an

FLSA violation was "willful," it is subject to a two year statute of limitations, and Plaintiff's

---

[1] Defendants Bucknell, et al., failed to raise the statute of limitations issue in their briefing. Despite that oversight, we will address the statute of limitations issue with respect to all Defendants.

participation with the Villanova football team concluded more than two years prior to his initiating this case. Defendants assert that the FOH provides clear guidance that student athletes are not employees under the FLSA; the fact that they were complying with this guidance in not paying Scholarship Athletes, they argue, precludes a finding that they willfully violated the FLSA. Def.s NCAA, et al., Mot at 15. Def.s NCCA, et al., Reply Brief in Support of Their Motion to Dismiss at 1-6.

Plaintiff responds that the question of whether Defendants acted willfully in violating the FLSA is a fact intensive inquiry "'that is typically inappropriate for summary judgment, much less [ ] the motion to dismiss stage.'" (quoting Reed v. Friendly's Ice Cream, LLC, 15-CV-0298, 2016 U.S. Dist. LEXIS 62197, at *19 (M.D. Pa. May 11, 2016)).

### ii.    Standing

With regard to standing, both sets of Defendants argue that Plaintiff does not have standing to pursue a claim against schools that he did not attend. Defendants urge the Court to adopt the reasoning from Berger that Plaintiff's connection to the NCAA and the schools he did not attend is too tenuous to establish standing because the injury alleged is not traceable to these defendants and cannot be redressed by them. Def.s NCAA, et al., Mot at. 18; Def.s Bucknell, et al., Mot at 20. The law in the Third Circuit supports this view, they argue. Def.s NCAA, et al., Mot at 19.

Defendants further argue that Plaintiff has not properly alleged joint employment against the NCAA and member schools under the operable test in the Third Circuit, set out in Enterprise Rent-A-Car, 683 F.3d at 468. Def.s Bucknell, et al., Mot. at 21-22; Def.s NCAA, et al., Mot at 20-23.

Plaintiff responds that standing via joint employment must be evaluated in a fact-intensive inquiry that is not ripe for determination on a motion to dismiss. Pl.'s Br. at 23. The Complaint, Plaintiff argues, sets forth allegations of joint control and employment that if proved will establish joint employment. Pl.'s Br. at 2425. See North American Soccer League v. NLRB, 613 F.2d 1379, 1382 (5th Cir. 1980).

### iii.    FLSA Claim

Both groups of Defendants argue that Plaintiff has not stated an actionable claim under the FLSA because Plaintiff has not properly alleged an employment relationship with Villanova, the NCAA, or any other Defendant school. Def.s NCAA, et al., Motion to Dismiss at 3; Def.s Bucknell, et al., Motion to Dismiss at 5.

Both groups rely heavily on two recent cases, Berger v. Nat'l Collegiate Athletic Ass'n, 162 F. Supp. 3d 845 (S.D. Ind. 2016), aff'd, 843 F.3d 285 (7th Cir. 2016), and Dawson v. Nat'l Collegiate Athletic Ass'n, 250 F. Supp. 3d 401 (N.D. Cal. 2017), which they argue stand for the principle that Division I athletes are not "employees" under the FLSA, as a matter of law, and are directly on point and consistent with controlling Third Circuit law. Def.s NCAA, et al., Mot at 4; 7-11; Def.s Bucknell, et al., Mot. at 11-12, 17-18.[2] Defendants argue that the Court should eschew a multi-factor test in evaluating the "economic reality" of Plaintiff's relationship with

---

[2] Defendants Bucknell et al. agree with the other group of Defendants that student athletes are not employees under the FLSA as a matter of law, however they severely misapprehend the nature of the precedential landscape in this area, and thus put forward a seriously flawed legal analysis in support of their position. They argue that the "economic reality" test is not appropriate for application in this situation because it "does not capture the true nature of the relationship between student athletes and their schools," and they urge this Court to take a different approach. Def.s Bucknell, et al., Mot. at 11. In fact, all courts evaluating alleged employer relationships under the FLSA must focus on the "economic reality" of those relationships, as this is the test the Supreme Court has embraced for the purpose of evaluating employee status under the FLSA. In some cases courts have found a multi-factor test is the best and most appropriate way to determine what that "economic reality" is, while in other cases, because such a test would simply distort that reality, a holistic approach is preferred. Defendants Bucknell et al., have persisted in their view that this Court should not apply the "economic reality" test, the fundamental and undisputed test for determining whether an employment relationship exists for purposes of the FLSA, despite this Court's invitation to these Defendants to reframe their argument. Defendants NCAA et al. argue within the confines of established case law on this issue, thus our analysis focuses on the points raised by these Defendants.

Defendants.  Def.s NCAA, et al., Mot at 5-11.  A holistic approach, they contend, reveals that the true nature of this relationship is defined by the "tradition of amateurism" in college sports, and therefore is not an employer-employee relationship.  Def.s NCAA, et al., Mot at 3.

Plaintiff responds that employee status under the FLSA is a fact-intensive, multi-factor inquiry that is not ripe for evaluation in this case at the Motion to Dismiss stage.  Pl.'s Br. at 7-8.  Plaintiff asserts that the FLSA analysis conducted in Dawson and Berger was improper, particularly the weight accorded the Seventh Circuit's decision regarding employee status of a particular group of prison laborers in Vanskike v. Peters, 974 F.2d 806 (7th Cir. 1992).  Pl.'s Br. at 25-26.  Plaintiff argues that the "primary beneficiary" test articulated in Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528 (2d Cir. 2015) should be applied to evaluate employee status in the context of student athletes.  Id.  Plaintiff argues that Berger, and Dawson after it, are the first cases to preclude FLSA claims for non-prisoners, and to reject non-prisoner FLSA claims at the Motion to Dismiss stage, declining to apply the appropriate multi-factor test to determine employment status.  Pl.'s Br. at 12-15.

The Defendants argue that the FOH clarifies that student athletes are not employees under the FLSA, and is persuasive authority on this Court.  Def.s Bucknell, et al., Mot. at 12-13.  Def.s NCAA, et al., Mot at 12, 15.  Plaintiff responds that the FOH guidelines are not dispositive on the legal issues at hand.  Pl.'s Br. at 11-12; 19.  Moreover, Plaintiff asserts that Defendants' reading of the FOH as regarding NCAA sports as the same as student-run groups is clearly contradicted both by the language of the FOH, and by the plain facts.  Pl.'s Br. at 19-23.

The Court will take each of Defendant's arguments in turn.

**B. Analysis**

      **i. Statute of Limitations**

Plaintiff's last season with Villanova football ended on December 13, 2014,[3] and this Complaint was filed on September 26, 2017, over two years later. The statute of limitations for FLSA claims is two years, unless an FLSA violation was willful, in which case the limitations period is extended to three years. 29 U.S.C. § 255(a). An FLSA violation "is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." Brock v. Richland Shoe Co., 799 F.2d 80, 81 (3d Cir. 1986), aff'd sub nom. McLaughlin v. Richland Shoe Co., 486 U.S. 128, (1988). "[A]n employer has not willfully violated the FLSA if it acts reasonably in determining its legal obligation." Pignataro v. Port Auth., 593 F.3d 265 (3d Cir. 2010) (citing McLaughlin v. Richland Shoe Co., 486 U.S. at 135 n. 13).

**1.     Plaintiff Has Failed to Adhere to Requirements of Iqbal and Twombly in Pleading Facts to Show "Willfulness" as "Plausible"**

Plaintiff contends that he has alleged "willfulness" sufficiently to survive a statute of limitations challenge at the Motion to Dismiss stage. He emphasizes that this is a question of fact that can only be resolved following discovery, and implies that his allegations plausibly plead "willfulness" such that if established as true they will bear out this characterization. Plaintiff offers no binding precedent, however, for the proposition that the question of "willfulness" is necessarily a fact-intensive inquiry that cannot be decided at the Motion to Dismiss stage, and this Court is aware of none. Moreover Plaintiff has not specifically alleged facts showing reckless disregard on behalf of either the NCAA or Villanova, with respect to their non-payment of Plaintiff. Plaintiff does not allege any facts regarding any school or the NCAA having knowledge of any potential duty to compensate Plaintiff, or even disregarding such a

---

[3] The Court takes judicial notice that the last game of the Villanova football team's 2014-15 season was on December 13, 2014, pursuant to the request of Defendants NCAA, et al. See, *http://www.villanova.com/sports/m-footbl/sched/nova-m-footblsched.html.* At oral argument, Plaintiff conceded this fact.

duty.  Unless Plaintiff can allege facts that if true would be sufficient to establish that the

Defendants acted intentionally or with reckless disregard to their obligations under the FLSA,

then his claim must be dismissed as time barred.  The Complaint falls short in this regard.

### 2. Plaintiff Has Failed to Plead Facts That Would Allow the Court to Deny the Motion to Dismiss on Statute of Limitations Grounds Despite Defendants' Reliance on FOH Guidance

Even if Plaintiff has sufficiently alleged "willfulness," Defendants argue that he cannot

avoid the impact of the FOH guidelines, which they assert undermine his claim of "willfulness."

The FOH states as follows: "University or college students who participate in activities generally

recognized as extracurricular are generally not considered to be employees within the meaning of

the Act."  U.S. Dep't of Labor, Field Operations Handbook, §10b24(a), available at:

https://www.dol.gov/whd/FOH/FOH_Ch10.pdf.  This section then references Section 10b03(e)

for a list of examples of students who "are not employees under the Act."  Section 10b03(e)

states, in relevant part:

> As part of their overall educational program, public or private
> schools and institutions of higher learning may permit or require
> students to engage in activities in connection with dramatics,
> student publications, glee clubs, bands, choirs, debating teams,
> radio stations, intramural and interscholastic athletics and other
> similar endeavors. Activities of students in such programs,
> conducted primarily for the benefit of the participants as a part of
> the educational opportunities provided to the students by the
> school or institution, are not work of the kind contemplated by
> section 3(g) of the Act and do not result in an employer-employee
> relationship between the student and the school or institution.

Available at: https://www.dol.gov/whd/FOH/FOH_Ch10.pdf.  It is significant that the FOH lists

participants in "interscholastic athletics" among a list of students who are "generally not

considered to be employees within the meaning of the [FLSA]," and notes that interscholastic

athletics "are not work of the kind contemplated by [the FLSA] and do not result in an employer-

employee relationship between the student and the school or institution." Given this explicit guidance, the conclusion that Defendants acted reasonably in determining that interscholastic student athletes are not entitled to compensation pursuant to the FLSA may be inevitable, and if so, their conduct cannot be "willful."

Plaintiff does not cite any allegations in the Complaint about the FOH. Plaintiff points out in his brief that the inclusion of "interscholastic athletics" in the FOH could conceivably be in reference to student-run interscholastic athletics, rather than NCAA-regulated athletics. Pl.s' Br. at 20. Plaintiff asserts that the fact that most of the other activities listed in Section 10b03(e) are student-run groups makes this interpretation more likely. This section of the FOH characterizes the nature of the activities it lists as falling outside the FLSA definition of "work" as being "conducted primarily for the benefit of the participants as a part of the educational opportunities provided to the students by the school or institution."

The Complaint does not make any allegations that would overcome the impact of the relatively straightforward FOH guidance to schools that their student athletes are not FLSA covered employees. Specifically, the impact of that guidance would likely require the Court to rule that Defendants acted reasonably in making the judgment that they need not compensate student athletes pursuant to the FLSA, and therefore that Defendants did not willfully violate the FLSA.

Plaintiff will, however, have the opportunity to amend his Complaint to allege additional facts, if he can, addressing willfulness in order to attempt to overcome the time bar to his claim. In order to be successful in this regard, Plaintiff will have to plead facts plausibly establishing willfulness, and must address the FOH guidelines and allege either facts or cite law to support

the conclusion that Defendants willfully violated the FLSA despite reliance on the FOH guidance.

> ### ii. Plaintiff Does Not Have Standing to Bring a Claim Against Schools He Did Not Attend

Even assuming that Plaintiff has pled facts sufficient to establish that Defendants willfully disregarded their obligations under the FLSA, Plaintiff cannot establish standing to bring an FLSA claim against any of the Defendant schools that he did not attend ("non-attended schools").

In order to establish that he has standing to bring a claim against any Defendant, Plaintiff must set forth facts to show "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81, (2000) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61, (1992)). Defendants challenge that Plaintiff cannot satisfy the second and third requirements with respect to any school that he has not attended, because his relationship to those schools is too attenuated such that his alleged injury is not traceable to them, and cannot likely be redressed by them.

Plaintiff contends that the Court should evaluate his claim against the non-attended schools under a theory of joint employment, implicitly conceding that without such a theory he cannot maintain these particular claims.

The standard for evaluating a joint employment claim in the Third Circuit was laid out in In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation, 683 F.3d 462 (3d Cir. 2012). The court located the "starting point" for this analysis with N.L.R.B. v. Browning-

<u>Ferris Indus. of PA.</u>, 691 F.2d 1117, 1123 (3d Cir. 1982): "'where two or more employers exert significant control over the same employees—whether from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' under the FLSA.'" <u>In re Enterprise Rent-A-Car</u>, 683 F.3d at 468 (quoting <u>Browning-Ferris</u>, 691 F.2d at 1124). The court recognized "significant control" exercised by the employer as the hallmark of an employment relationship, rejecting the need for a finding of "ultimate control" and indicating that even "indirect" control "may be sufficient." <u>In re Enterprise Rent-A-Car</u>, 683 F.3d at 468. The court identified four factors to be considered in evaluating alleged employer-employee relationships in the joint employment context:

1) The alleged employer's authority to hire and fire the relevant employees;

2) The alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment;

3) The alleged employer's involvement in day-to-day employee supervision, including employee discipline; and

4) The alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

The court emphasized that "this list is not exhaustive," but rather that courts should look to "the total employment situation and the economic realities of the work relationship…including evidence that does not fall neatly within one of the [four] factors." <u>In re Enterprise Rent-A-Car</u>, 683 F.3d at 469.

Plaintiff clearly cannot establish that he was jointly employed by Villanova, the NCAA, and the non-attended schools. The non-attended schools did not have "significant control" over

Plaintiff, as revealed both by reference to the four factors outlined in <u>In re Enterprise Rent-A-Car</u>, and by a holistic review of Plaintiff's relationship to those schools, taking the allegations in the light most favorable to Plaintiff, and considering the "economic reality" of the situation. The non-attended schools did not have authority to hire or fire Plaintiff as a Villanova football player; they had no authority to promulgate rules applicable to Plaintiff or to issue assignments for him to complete; they had no involvement whatsoever in his day-to-day supervision; and they had no actual control of the records relating to Plaintiff's participation on the Villanova football team. These schools did not even have indirect control over Plaintiff.

The only allegation Plaintiff cites to support a finding of joint employment is the existence of extensive NCAA bylaws that are agreed to and followed by all NCAA member schools, including the non-attended schools. These rules allegedly imposed a particular structure on Plaintiff's daily practice and competition schedule, rules about his eligibility to play football for Villanova, and a disciplinary structure. But Plaintiff cannot allege the rules were handed down or enforced by the non-attended schools. The non-attended schools cannot gain control over Plaintiff simply by agreeing to submit to these rules.

Plaintiff alleges, for example, that NCAA Division I Bylaws 17.02.1, 17.1.7.1 and 17.1.7.2 limit the number of weekly hours a student athlete can practice their sport under the supervision of coaching staff, and NCAA Division I Bylaw 17.1.7.3.4 requires each school to record these hours. (Compl. ¶¶ 162-64.) These rules in no way authorized the non-attended schools to directly exert control over Plaintiff, and Plaintiff cannot allege any facts suggesting that any of the non-attended schools did exert any control over Plaintiff in relation to these issues. The simple fact that the non-attended schools also agreed to abide by these rules with respect to their own students in no way suggests that they had control over Plaintiff as well. As

another example, Plaintiff alleges that NCAA Division I Bylaws 19.3.1, 19.3.4, 19.4.1 and 19.4.3, which establish the NCAA Committee on Infractions and NCAA Infractions Appeals Committee, which include representatives from peer institutions on disciplinary committees convened to review student athlete conduct.  (Compl. ¶ 170.)  This limited form of oversight is a far cry from "indirect control," much less does it establish "significant control."

Plaintiff relies heavily on a Fifth Circuit case, <u>North American Soccer League v. NLRB</u>, 613 F.2d 1379 (5th Cir. 1980), which he contends supports his position that he has in fact plead joint employment.  In that case, the Fifth Circuit affirmed the N.L.R.B.'s determination that the North American Soccer League (NASL), an association comprised of twenty-four member clubs, and all twenty-four member clubs, together were joint employers of each of the team's players.  The court explained that "[t]he existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other."  <u>North American Soccer League</u>, 613 F.2d at 1382.  The court's ruling that the evidence supported the NLRB's finding that the League and the clubs were joint employers was based on record evidence suggesting that "the League exercises a significant degree of control over essential aspects of the clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individuals player contracts, dispute resolution and player discipline," and the fact that "each club granted the NASL authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs."  <u>North American Soccer League</u>, 613F.2d at 1382.

While the facts may appear somewhat similar, even if <u>North American Soccer League</u> was controlling on this Court, which it is not,[4] it would not command the result that Plaintiff was

---

[4] Because the Third Circuit cited favorably to <u>North American Soccer League</u> in <u>Browning-Ferris</u>, and in light of Plaintiff's strong reliance on it, it is worth brief consideration.

jointly employed by Villanova, the NCAA, and the non-attended schools. First, it was not a

FLSA case. Second, the soccer players at issue in North American Soccer League were not

students, distinguishing that case from the present case. Moreover, the Fifth Circuit in North

American Soccer League noted "that minor differences in the underlying facts might justify

different findings on the joint employer issue." North American Soccer League, 613 F.2d at

1382-83. One such possibly major difference is that the facts in North American Soccer League

demonstrated a more significant management role for each individual soccer team in the

management of the League as a whole, by virtue of their membership in the League, than

Plaintiff alleges with respect to NCAA member schools. North American Soccer League, 613

F.2d at 1382 ("A board of directors composed of one representative of each club assists [the

League commissioner] in managing the League.")

        As already discussed, Plaintiff has essentially conceded that without a theory of joint

employment he cannot maintain a claim against the schools that he did not attend. Even

assuming Plaintiff did not so concede, this Court must conclude that Plaintiff has failed to allege,

and cannot plausibly amend to allege, facts properly stating joint employment, thus his claims

against the non-attended schools cannot stand.

        Plaintiff's FLSA claim against the Defendant schools that he did not attend will be

dismissed with prejudice.

        iii.        The Complaint Fails to State an Actionable Claim Under the FLSA as
                    to Villanova University and the NCAA

        Even if the Complaint properly alleges that Defendants Villanova University and the

NCAA acted unreasonably and therefore willfully in interpreting their obligations under the

FLSA with respect to student athletes, and therefore the FLSA claim is not beyond the statute of

limitations, the Complaint fails to plead an actionable FLSA claim against Villanova and the

NCAA. The primary question at issue here is whether or not Plaintiff falls within the definition of "employee" as it is understood in the context of the FLSA, and ultimately we conclude that the Complaint fails to properly state a claim that he does.

### 1.     Applicable Law: "Economic Reality"

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). As the Third Circuit has observed, "[t]his statutory definition is 'necessarily broad to effectuate the remedial purposes of the Act." Safarian v. American DG Energy Inc., 622 Fed.Appx. 149, 151 (3d Cir. 2015) (quoting Martin v. Selker Bros., 949 F.2d 1286 (3d Cir. 1991). For analytical purposes, "courts must look to the economic realities of the relationship in determining employee status under the FLSA." Id. See also, Tony & Susan Alamo Found. V. Sec'y of Labor, 471 U.S. 290, 301 (1985) ("The test of employment under the Act is one of 'economic reality'....").

In some circumstances, the Third Circuit has invoked a multi-factor test to evaluate the "economic realities" of employment relationships for the purpose of determining FLSA rights.

### a.     Donovan v. DialAmerica Marketing, Inc.[5]

In Donovan v. DialAmerica Marketing, Inc., 757 F.2d 1376 (3d Cir. 1985) the Third Circuit adopted a six factor test to be applied in determining "employee" status under the FLSA, which instructs courts to consider the following:

> 1)   The degree of the alleged employer's right to control the
>      manner in which the work is to be performed;

---

[5] This Court recently had occasion to decide a case applying Donovan, finding that Uber Black drivers are independent contractors, not "employees," as a matter of law. Razak v. Uber Technologies, Inc., 2018 WL 1744467 (E.D. Pa., April 11, 2018).

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

4) whether the service rendered requires a special skill;

5) the degree of permanence of the working relationship;

6) whether the service rendered is an integral part of the alleged employer's business.

Donovan, 757 F.2d at 1382 (quoting Donovan v. Sureway Cleaners, 656 F.2d 1368 (9th Cir. 1981). The court emphasized that in evaluating employee status "the circumstances of the whole activity should be examined rather than any one particular factor." Donovan, 757 F.2d at 1382. "[C]ourts…should consider whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." Id. (internal quotation omitted).

As in Donovan, the cases that have followed it in applying the multi-factor test have dealt with the question of whether particular workers who receive monetary compensation for their work, under varying conditions and circumstances, are in fact "employees" entitled to FLSA coverage. See, Martin v. Selker Bros., Inc., 949 F.2d 1286 (3d Cir. 1991) (holding that gas station operators were employees, rather than independent contractors, of gasoline distributor); Safarian v. American DG Energy Inc., 622 Fed.Appx. 149 (3d Cir. 2015) (remanding for the District Court to apply the six-factor test from Donovan to the issue of whether an engineer for a utility business was an employee or an independent contractor, given that the lower court had identified the factors but failed to reason through them). The question before this Court, however, presents a different issue, that has to do more with the threshold question of who is properly considered to be a worker entitled to compensation at all, rather than what types of

workers <u>who in fact do receive compensation</u> fall under the FLSA's definition of "employee." This question is very close to the question that the Supreme Court answered in <u>Tony & Susan Alamo Found. v. Sec'y of Labor</u>, 471 U.S. 290 (1985).

### b. <u>Tony & Susan Alamo Foundation v. Sec'y of Labor</u>

In <u>Tony & Susan Alamo Foundation</u> the Supreme Court held that individuals engaged in the ordinary commercial activities of a religious foundation, including staffing retail clothing and grocery outlets, roofing and electrical construction companies, and a motel, were "employees" under the FLSA and therefore entitled to its protections, despite the fact that they received no cash salaries and did not consider themselves to be employees, but rather volunteers working for religious reasons. <u>Tony & Susan Alamo Foundation</u>, 471 U.S. at 293-303. The Court applied the "economic reality" test to reach this conclusion. The Court was not persuaded by the workers' sincere opposition to receiving monetary compensation, or the fact that they had no expectation of receiving payment whatsoever, noting these considerations "cannot be dispositive." <u>Id.</u> at 300-302. The Court relied on the fact that the workers received and depended on non-cash benefits from the foundation, including food, clothing, and shelter, as evidence that there was an "implied" compensation agreement, which supported the conclusion that the workers were employees. <u>Id.</u> at 301. The Court observed that these benefits are "wages in another form" and that the individuals in this case were "entirely dependent upon the Foundation for long periods," ultimately finding that as a matter of "economic reality" they were employees. <u>Id.</u>

Plaintiff relies heavily on <u>Tony & Susan Alamo Foundation</u>, most helpfully for the proposition that non-payment does not preclude a finding of an employee-employer relationship

under the FLSA.  Indeed, this is an important point that emerges from <u>Tony & Susan Alamo Foundation</u>.  However, the broader message of that case is that in evaluating whether a particular person is an "employee" within the meaning of the FLSA, a holistic approach to the fundamental task of discerning the "economic reality" of the relationship between the alleged employee and employer may be appropriate and necessary.

The Defendants also rely on this proposition, however for a different purpose.  The Defendants rely most heavily on two recent cases that dealt with the issue of whether a student athlete can properly state a claim for entitlement to minimum wage under the FLSA based on their performance as student athletes in NCAA athletics.  Both of these cases rejected the application of a multi-factor test in favor of a broad, holistic application of the "economic reality" test to answer this question.

### c.   **Berger v. Nat'l Collegiate Athletic Ass'n and Dawson v. NCAA**

The Seventh Circuit considered the issue of whether student athletes are entitled to minimum wage compensation under the FLSA in the context of track athletes at the University of Pennsylvania, a school that does not offer the type of Athletic Scholarships that Plaintiff received at Villanova, in <u>Berger v. Nat'l Collegiate Athletic Ass'n</u>, 843 F.3d 285 (7th Cir. 2016). In <u>Dawson v. NCAA</u>, 250 F.Supp.3d 401 (N.D. Cal. April 25, 2017) the Plaintiff, a former college football player at the University of Southern California, brought suit against the NCAA and the Pac-12 Conference for FLSA violation, alleging a joint employment theory.  The District Court granted a motion to dismiss the Complaint against both defendants, and an appeal is pending.  The case before this Court presents a slightly different set of facts, most significantly because Plaintiff bases his claim specifically on his performance and experience as an Athletic

Scholarship recipient, and tailors his allegations to focus on the Athletic Scholarship arrangement.

In evaluating whether Plaintiffs had stated a claim against Penn, the Seventh Circuit in Berger v. Nat'l Collegiate Athletic Ass'n, 843 F.3d 285 (7th Cir. 2016) made clear that because employee status under the FLSA "depends on the totality of circumstances rather than on any technical label, courts must examine the 'economic reality' of the working relationship." Berger, 843 F.3d at 290 (citing Vanskike v. Peters, 974 F.2d 806, 808 (7th Cir. 1992)). The Seventh Circuit declined Plaintiff's invitation to apply the multi-factor test created by the Second Circuit in Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536-37 (2d Cir. 2015) to determine whether interns are employees under the FLSA. Moreover, the Seventh Circuit rejected the use of a multifactor test generally because this approach would "fail to capture the true nature of the relationship between student athletes and their schools," in particular, the "long-standing tradition" of amateurism that "defines the economic reality of the relationship between student athletes and their schools." Berger, 843 F.3d at 291.

Beyond the tradition of amateurism, the Seventh Circuit highlighted case law and DOL guidelines in support of its conclusion that Plaintiffs had failed to plead that they are employees under the FLSA. The court pointed to the fact that a majority of courts to have considered the issue in various contexts have concluded that student athletes are not employees. Berger, 843 F.3d at 291-92. With respect to DOL guidelines, the court indicated that the DOL's FOH is "persuasive" authority on the court, including the statement in Section 10b03(e) of the FOH that describes interscholastic athletics as primarily for the benefit of students and clarifies that student participation in interscholastic athletics is not covered by the FLSA. Id. at 292-93. Finally, the court added that "participation in collegiate athletics is entirely voluntary" before reiterating that

"the long tradition of amateurism in college sports...shows that student athletes…participate in their sports for reasons wholly unrelated to immediate compensation." Id. at 293.

Dawson v. NCAA, 250 F.Supp.3d 401 (N.D. Cal. April 25, 2017), like Berger, highlighted case law and the DOL's FOH guidelines in reaching its conclusion that Plaintiff is not an employee under the FLSA. The court observed that the majority of courts to have considered the issue have concluded that student athletes are not employees. In addition, the court emphasized that the FOH guidelines "are entitled to respect," including the statement in Section 10b03(e) that describes interscholastic athletics as primarily for the benefit of students and that indicates that student athletes do not engage in work covered by the FLSA. Dawson, 250 F.Supp at 406-7.

Dawson rejected Plaintiff's argument that Division I football and other revenue-generating interscholastic sports should not be considered to be covered by this FOH statement. The court emphasized that Section 10b03(e) "refers broadly to 'interscholastic athletics'…and does not distinguish between sports that generate revenue and those that do not." Dawson, 250 F.Supp at 407. In addition the court made a judgment that "there is a difference between work-study programs, which exist for the benefit of the school, and football programs, which exist for the benefit of students and, in some limited circumstances, also benefit the school." Id. at 407. Additionally, the court emphasized that "the premise that revenue generation is determinative of employment status is not supported by the case law." Id.

### d.     Vanskike v. Peters

Both Berger and Dawson relied heavily on Vanskike v. Peters, 974 F.2d 806 (7th Cir. 1992) as precedent for, and an example of, the rejection of a multi-factor test to evaluate the

"economic reality" of alleged employment relationships in special circumstances. In <u>Vanskike</u> the Seventh Circuit rejected a multifactor test in favor of a holistic application of the "economic reality" test in evaluating whether Mr. Vanskike, who was assigned to work for the Department of Corrections within a DOC facility while incarcerated there, was an "employee" under the FLSA. The court observed that "the Thirteenth Amendment excludes convicted criminals from the prohibition of involuntary servitude, so prisoners may be required to work." <u>Vanskike</u>, 974 F.2d at 809. The court indicated that the four factor test that had been applied in other cases evaluating whether prisoners engaging in different types of work were "employees" under the FLSA was "not the most helpful guide in the situation presented." <u>Id.</u> Such a test, the court reasoned, is "particularly appropriate where…it is clear that some entity is an 'employer' and the question is which one," whereas the issue posed by Vanskike's complaint was "a more fundamental one: Can this prisoner plausibly be said to be 'employed' in the relevant sense at all?" <u>Id.</u> Ultimately the Seventh Circuit held that "[b]ecause Vanskike's allegations reveal that he worked in the prison and for the DOC pursuant to penological work assignments, the economic reality is that he was not an 'employee' under the FLSA." <u>Id.</u> at 810.

<u>Vanskike</u>, like <u>Tony & Susan Alamo Foundation</u>, suggests that in order to determine the "economic reality" of an alleged employment relationship, courts need not rely on a formula in order to divine the true nature of that relationship. <u>Vanskike</u> is not controlling on this Court.[6]

## 2. Analysis

Plaintiff contends that the fact that Scholarship Athletes are not paid does not preclude a finding that they are "employees" under the FLSA. Plaintiff may not necessarily be precluded,

---

[6] Similarly, <u>Glatt v. Fox Searchlight Pictures, Inc.</u>, 811 F.3d 528 (2d Cir. 2015), is likewise not controlling on this Court; that case involved an FLSA claim by unpaid interns and endorsed a standard that considers whether the intern or the employer is the "primary beneficiary" of the relationship.

as a matter of law, by his non-payment by Villanova or the NCAA from stating a plausible claim that he is an "employee" under the FLSA.  However, it does not follow that he necessarily fits this definition.  The Complaint does not allege facts sufficient to establish that the "economic reality" of the relationship between Plaintiff and Villanova University, or between Plaintiff and the NCAA, is one of employee to employer.  Plaintiff alleges that he received a full academic scholarship in return for his agreement to participate as a member of the Villanova football team, which could be seen in a similar light to the benefits that the workers in <u>Tony & Susan Alamo Foundation</u> received and which the Supreme Court viewed as "wages in another form."  While similar, though, Plaintiff has not alleged facts tending to establish that he relied on these benefits to the same extent as the workers in <u>Tony & Susan Alamo Foundation</u>, who were "entirely dependent upon the Foundation for long periods."  Plaintiff has alleged merely that his scholarship served to "defray the costs of attendance" at Villanova.  This is a far cry from the absolute dependence by the <u>Tony & Susan Alamo Foundation</u> workers on the Foundation for their livelihoods—an "economic reality" which the Supreme Court held reflected an employment relationship.  Plaintiff's allegations do not rise to this level.

The Complaint is deficient in other ways as well.  Plaintiff includes extensive references to the NCAA member agreement, which relates to his alleged employment by schools that he did not attend.  As Plaintiff does not have standing to pursue FLSA claims against these schools, these facts go far beyond the scope of what is relevant to his cause of action.  Plaintiff also fails to plead any facts to allow the Court to ignore the impact of the FOH guidance suggesting that student athletes who compete in interscholastic athletics are not "employees" under the FLSA.  While the DOL's interpretation in the FOH is "not controlling" on this Court, it is "persuasive." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 140 (1944).

Defendants request the Court to endorse their argument that a multi-factor test is not appropriate for evaluating whether a student athlete is an employee under the FLSA, which we decline to do at this time. True, in some situations multi-factor tests may fail to capture the true nature of an alleged employment relationship, and therefore may not be the proper vehicle for discerning the "economic reality," the concept that the Court must consider in this evaluation. This may be the case here, as Berger and Dawson both found, but we take no position on this issue at this time. While much of our analysis has centered around a holistic application of the "economic reality" test, as in Tony & Susan Alamo Foundation, this does not foreclose the possibility that an appropriate multi-factor test could be identified for evaluating the question of whether a student athlete who receives an Athletic Scholarship is an "employee" for FLSA purposes. Any such test would likely lean on the factors outlined by the Third Circuit in Donovan, a standard thus far used for the purpose of distinguishing between employees and independent contractors, but which may offer a useful starting point for developing rules of analysis for the threshold question of who is an "employee" at all.

## V. Conclusion

Defendant's Motion will be granted in full.

Count I is dismissed with prejudice, without leave to amend, with respect to all of the Defendant schools that Plaintiff did not attend: Bucknell University, Drexel University, Lafayette College, Lehigh University, Duquesne University, Fairleigh Dickinson University, La Salle University, Monmouth University, the Pennsylvania State University, Rider University, Robert Morris University, Rutgers, The State University of New Jersey, Saint Francis University, Saint Joseph's University, St. Peter's University, Seton Hall University, Temple University, University of Delaware, University of Pittsburgh.

Count I is dismissed without prejudice, with leave to amend, with respect to Villanova

University and the NCAA.[7]

O:\CIVIL 17\17-4271 Livers v NCAA\17cv4271 memorandum op MTD 05172018.docx

---

[7] The Court does not decide that Plaintiff can state a claim against the NCAA, only that Plaintiff may attempt to do so.